UNITED STATES of America,
Plaintiff-Appellee,

v.

Keith WEDDELL, and Willie Hammond,
Jr., Defendants-Appellants.

No. 85–1676.

United States Court of Appeals,
Fifth Circuit.

Oct. 1, 1986.

Travis D. Shelton, Travis Dale Jones, Lubbock, Tex., for Weddell.

Warren Burnett, Odessa, Tex., Larry Zinn, San Antonio, Tex., for Hammond.

Sidney Powell, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., Michael R. Hardy, Asst. U.S. Atty., San Antonio, Tex., James Blankinship, Asst. U.S. Atty., Midland, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, RUBIN and GARZA, Circuit Judges.

GARZA, Circuit Judge:

City Councilman Keith Weddell, Will Weddell, Mayor Bob Bryant and attorney Ray Stoker, Jr., purchased the O'Michael Building, a two-story commercial office building in downtown Odessa, Texas, on July 1, 1980, for $135,000. Although the building was titled solely in Stoker's name, Keith Weddell kept the books and managed the building. In June, 1981, the owners increased the insurance coverage on the building from $200,000 to $420,000.

On November 25, 1981, at approximately 1:00 a.m., a fire severely damaged the O'Michael Building; state and local investigators eventually determined that the fire was the work of arsonists. The owners eventually sold the building for $150,000 and, after a settlement agreement, collected $160,000 in insurance proceeds.

In June, 1982, John Peterson, along with his brother Lawrence "Cotton" Peterson, and L.C. Burditt gave statements to the FBI implicating themselves in the arson. All three men had been convicted of felonies. A long government investigation ensued, and, on September 20, 1984, Keith Weddell and Willie Hammond, Jr., a county commissioner, were indicted for conspiracy to commit arson in violation of 18 U.S.C. §§ 844(i) and 371 (Count 1) and for aiding and abetting the arson in violation of 18 U.S.C. §§ 844(i) and (2) (Count 2).[1]

Appellants' first trial, held in Midland, Texas, in February, 1985, resulted in a hung jury. The district court declared a mistrial and ordered the case transferred to El Paso for a second trial because of extensive publicity. Appellants were subsequently convicted on all counts. Appellants contend on appeal that the district court erred in transferring the case from

---

1. The relevant statutes provide in pertinent part:
 Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both.
 18 U.S.C. § 844(i).
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. . . .
 18 U.S.C. § 371.
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 18 U.S.C. § 2.
 In addition, Hammond was charged in Counts 3 and 4 with perjury in violation of 18 U.S.C. § 1623. Hammond's subsequent perjury convictions are not before this Court on appeal.

Midland to El Paso. Weddell also argues that the evidence was insufficient to support his conspiracy and aiding and abetting convictions, while Hammond asserts that prosecutorial misconduct warrants a reversal of his convictions. Weddell and Hammond each take issue with the lower court's evidentiary rulings.

## I.

## TRANSFER OF THE CASE

■■■ Absent a request from the defendant, a trial court may not order a change of venue because of pretrial or trial publicity. Fed.P.Crim.P. 21(a). *United States v. Stratton*, 649 F.2d 1066, 1076 (5th Cir.1981) (Unit A). However, because venue exists anywhere within the judicial district in which the crime was committed, there is no right to trial within a particular division in a district.[2] *United States v. Dickie*, 775 F.2d 607, 610 (5th Cir.1985). *United States v. James*, 528 F.2d 999, 1021 (5th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). Moreover, a district court judge has "broad discretion in determining whether transfer [within a judicial district] is warranted." *United States v. Alvarado*, 647 F.2d 537, 539 (5th Cir.1981). "Reversal is proper only where a party demonstrates a 'substantial ground for overturning the district court's [decision regarding an] intradistrict transfer'." *Dickie*, 775 F.2d at 609 (quoting *United States v. Malmay*, 671 F.2d 869, 876 (5th Cir.1982) ). Accordingly, the court's decision to transfer a case within a district is subject to the abuse of discretion standard of review. *Id.* at 610; *Alvarado*, 647 F.2d at 539; *United States v. McRary*, 616 F.2d 181, 185 (5th Cir.1980), *cert. denied*, 456 U.S. 1011, 102 S.Ct. 2306, 73 L.Ed.2d 1307 (1982).

■■ Appellants argue that the district court abused its discretion under Fed.R.

Crim.P. 18 by failing to regard the convenience of the defendants and their witnesses. Rule 18 provides:

Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

Assuming that the transfer to El Paso was inconvenient to Appellants and their witness, the court, however, was also required to fix the place of trial with due regard to the "prompt administration of justice." In response to Appellants' request to move the trial back to Midland, the district judge stated:

Let the record reflect that I will not send the case back to the Midland-Odessa Division, that the case was previously tried there and ended in a mistrial with a hung jury. There was an inordinant [sic] amount of publicity and I do not believe that it would be fair to either Mr. Hammond or Mr. Weddell or the Government to attempt to try to select a jury there. As a consequence the Court on its own motion, without any request by either Defendant or the Government did transfer the case here last ... February....

It is apparent that the court considered the extensive publicity surrounding the first trial of these local public officials, and determined that a trial in Odessa would not be fair to the parties, and thus, would not further the administration of justice. We, therefore, find no basis for overturning the court's decision. *See Dickie*, 775 F.2d at 610.

## II.

## SUFFICIENCY OF THE EVIDENCE

It is well settled that an appellate court must review the sufficiency of the evidence

---

**2.** Article III, section 2, clause 3 of the United States Constitution provides that "The Trial of all Crimes, except in Cases of Impeachment, shall be ... held in the State where the said crimes shall have been committed...." The Sixth Amendment expands this rule and ex-

presses it as a right of the accused by providing that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed ..." U.S. Const. amend. VI (emphasis added).

and the inferences to be drawn from it in the light most favorable to the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). *United States v. Steinfels,* 753 F.2d 373, 377 (5th Cir.1985). "It is the sole province of the jury to weigh the evidence and to determine the credibility of the witnesses." *United States v. Ortiz-Loya,* 777 F.2d 973, 979 (5th Cir.1985). In reviewing Weddell's convictions, we must, taking the view most favorable to the government, determine whether a reasonably-minded jury could accept the evidence, whether direct or circumstantial, as sufficient to support the conclusion that Weddell was guilty of conspiracy and aiding and abetting the arson beyond a reasonable doubt. *See Ortiz-Loya,* 777 F.2d at 979; *United States v. Warner,* 441 F.2d 821, 825 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). *See also Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ("the relevant question is whether ... *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

*Conspiracy*

■ "A conviction for conspiracy under 18 U.S.C. § 371 requires that the government prove beyond a reasonable doubt (1) an agreement between two or more persons, (2) to commit a crime, and (3) an overt act by one of the conspirators in furtherance of the agreement." *Ortiz-Loya,* 777 F.2d at 981; *United States v. Saenz,* 747 F.2d 930, 937 (5th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985). Moreover, "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola,* 420 U.S. 671, 686, 95 S.Ct. 1255, 1265, 43 L.Ed.2d 541 (1975); *United States v. Wieschenberg,* 604 F.2d 326, 331 (5th Cir.1979). Weddell does not dispute that Hammond or the admitted arsonists committed an overt act in furtherance of an agreement to commit arson in violation of 18 U.S.C. § 844(i), or that the arson took place. Therefore, our inquiry is whether there was sufficient evidence to support the jury's conclusion that Weddell entered into the agreement with Hammond or one of the arsonists.

According to Weddell, the government's only "direct attempt" linking him to the conspiracy was based on the testimony of John Peterson. Weddell contends that Peterson's testimony should have been excluded under the ruling of this court in *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). In *James* we held that a coconspirator's declaration was admissible when it has been

> shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy and (3) that the statement was made during the course and in furtherance of the conspiracy.

*Id.* at 582. Our holding was necessary to avoid the serious danger of prejudice to the accused from an erroneously admitted statement, and also "comport[ed] with earlier Supreme Court pronouncements that admissibility must depend upon independent evidence in order to prevent [a] statement from 'lift[ing] itself by its own boot straps to the level of competent evidence'." *Id.* at 581 (quoting *Glasser,* 315 U.S. at 75, 62 S.Ct. at 467).

Based on our review of the record, we find substantial, independent evidence of a conspiracy among Weddell, Hammond and the others aside from any testimony of Peterson which would otherwise be inadmissible. Testimony of a state arson investigator established (1) that Weddell owned a 50% interest in the O'Michael Building; (2) that he and his co-purchasers bought the building with knowledge of a proposed civic center project for the area; (3) that the building was titled solely in Stoker's name to avoid any appearance of impropriety when the purchasers sold the property

to the city for the civic center; and (4) that expenses on the O'Michael Building exceeded its revenues. Additional testimony established that, notwithstanding the failure of the bond election for the construction of the civic center project, the owners injected capital into the building on fifteen occasions and increased their insurance coverage.

In addition to the foregoing circumstantial evidence, Peterson testified that Hammond, a close personal friend for whom he had campaigned during the latter's election for county commissioner, approached and offered him $15,000 to burn the O'Michael Building. Peterson further testified that in a subsequent meeting with Weddell and Hammond, Weddell stated that "it was time to collect some insurance;" that "he (Weddell) could come up with about 5,000 now, and in about ten days to two weeks he could get the rest;" and that "he would get Willie [Hammond] a key to the building." Peterson's testimony on these matters alone supports a finding of conspiracy and is not inadmissible hearsay as Weddell contends, but rather, is admissible under Fed. R.Evid 801(d)(2)(A) as admissions by a party-opponent. *See e.g., United States v. Lamp,* 779 F.2d 1088, 1094 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986) (the district court was entitled to consider a coconspirator's testimony of the defendants' *own* statements and actions in determining whether the defendants were members of the conspiracy); *United States v. Clemmons,* 676 F.2d 122, 123 (5th Cir.1982) (Unit B) ("Any and all statements of an accused, so far as they are not excluded by the doctrine of confessions or by the privelege of selfincrimination, are usable against the accused and are not hearsay").

■ Because substantial independent evidence of a conspiracy between Weddell and the other coconspirators was present, Peterson's testimony that Hammond had stated that Weddell wanted the fire started on the second floor of the O'Michael Building, as well as any other statements implicating Weddell and in furtherance of the conspiracy, was admissible under *James.* We conclude that the evidence cited thus far, standing alone, viewed in the light most favorable to the government, is adequate and sufficient to sustain Weddell's conviction in Count 1 of conspiracy to commit arson in violation of 18 U.S.C. §§ 844(i) and 371.

*Aiding and Abetting*

A conviction for aiding and abetting under 18 U.S.C. § 2(a) requires the government to establish that the defendant wilfully associated himself in some way with the criminal venture and wilfully participated in it as he would in something he wished to bring about *United States v. Fischel,* 686 F.2d 1082, 1087 (5th Cir.1982). 'Association means that the defendant shared in the criminal intent of the principal. Participation means that the defendant engaged in some affirmative conduct designed to aid the venture.' *United States v. Colwell,* 764 F.2d 1070, 1072 (5th Cir.1985) *Ortiz-Loya,* 777 F.2d at 980. We conclude, without difficulty, that the evidence recounted above, when viewed in the light most favorable to the government, sufficiently establishes, beyond a reasonable doubt, that Weddell wilfully associated and participated in the arson of the O'Michael Building and, hence, supports Weddell's conviction in Count 2 of aiding and abetting the arson in violation of 18 U.S.C. §§ 844(i) and 2.

## III.

## PROSECUTORIAL MISCONDUCT

*Background*

According to testimony taken by the district court *in camera,* sometime between the first and second trials there was contact between the FBI and Hammond's wife, Helen Hammond. Mrs. Hammond testified that she went down to the Odessa Police Station to report a burglary at their home. While there, Odessa lawmen "suggested" that she contact the FBI and she did so. By the week before the second trial, Mrs. Hammond was contacted by the FBI and

agreed to be picked up. She was taken to an Odessa motel and there met some FBI agents and Assistant U.S. Attorney Tom McHugh. The district court concluded that Mrs. Hammond was never informed of her right to refuse these interviews.

At about this time, McHugh contacted the trial court *ex parte*, stated that there was a possibility that Mrs. Hammond would be a witness for the government, and asked for an exemption from the court's standing discovery order, as to Mrs. Hammond. The order required the government to disclose in advance its witness list to the defense. The court granted the government's request. Subsequently, the district court found that Mrs. Hammond never expressed a willingness to be witness for the government against her husband.

Knowing nothing of these events, counsel for Hammond announced to the jury, during opening argument, that Mrs. Hammond "won't be here today because she couldn't get off work today. But she will get off work, she will come here and you will see and meet her as well." We don't find anywhere where the jury was informed that Mrs. Hammond would testify in behalf of her husband during the trial. After the trial she did file an affidavit attached to a motion filed by Willie Hammond Jr.'s attorneys that requested that the court dismiss the indictment or alternatively grant a new trial. In that affidavit, Mrs. Hammond says that she and her husband had agreed "that because of her work schedule with Phillips Petroleum, and, as well, her college course schedule, she would not attend during the first few days of his trial, but would go to El Paso near the middle of the first week of trial, attend the trial, and support him in every way including testifying in his behalf."

On the second day of trial, at about 9:00 p.m., however, FBI agents "served" a subpoena to testify on Mrs. Hammond in Odessa. The agents then took Mrs. Hammond and the Hammond's two children, daughter–17, son–8, to a motel in Midland. Mrs. Hammond believed that she had no choice but to go with the agents and that she was in their custody. The agents stayed in an adjoining motel room.

Hammond apparently being completely unaware of these events, made an effort to communicate with his wife. Early the next morning during the middle of the trial defense counsel approached the court requesting an immediate hearing on their belief that Mrs. Hammond had been "kidnapped" the previous evening by FBI agents. During an in camera hearing, the government made known to the court and counsel for the defendants that it intended to call Mrs. Hammond to testify. The court then made known to defense counsel its earlier action in allowing the government an exemption of the name of Mrs. Hammond from its witness list. Upon questioning by the court as to Mrs. Hammond's immediate whereabouts, the government stated that FBI agents were escorting her from Odessa, Texas to El Paso, approximately 300 miles. The court then ordered the government to bring Mrs. Hammond to the court's chambers upon her arrival in El Paso. The government failed to comply with this order.

After being notified by defense counsel that Mrs. Hammond had been in the FBI office at the federal courthouse in El Paso for several hours, the court ordered her immediate presence in chambers. The court then conducted an in camera interview with Mrs. Hammond. The court found that Mrs. Hammond did not wish to testify against her husband and appeared to be completely unaware of the fact that she could not be compelled to testify against her husband. The court also learned of the forced separation between Mrs. Hammond and her children. Upon arrival in El Paso that morning, Mrs. Hammond was taken to the federal courthouse and her children were taken to a motel.

At the beginning of the next day of trial, Hammond moved for dismissal, or alternatively, mistrial because of the government's conduct and the *ex parte* communication between the court and the government. The motions were denied. After trial Hammond filed his Motion to Dismiss

Indictment, or alternatively, Motion for a New Trial. These motions were eventually denied. However, on October 21, 1985, the court entered an Order unsealing the in camera matters and blasted the government for its conduct toward Mrs. Hammond.

*Discussion*

■ Hammond argues that the government's conduct in this case interfered with his ability to call his wife as a witness on his behalf, and thus, violated his right of due process. Hammond contends that the government's misconduct warrants a *per se* reversal of his convictions and dismissal of his indictment, or alternatively, a new trial.

Federal courts must take special care to assure that prosecutorial conduct in no way impermissibly infringes upon specific guarantees of the Bill of Rights, such as the right to counsel or the privilege against compulsory self-incrimination. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). The Sixth Amendment guarantees an accused "the right to present his own witnesses to establish a defense." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). *See Webb v. Texas*, 409 U.S. 95, 98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330 (1972); *Cool v. United States*, 409 U.S. 100, 104, 93 S.Ct. 354, 357, 34 L.Ed.2d 335 (1972). This court, moreover, has held that "[s]ubstantial government interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant ... [and that] ... [i]f such a due process violation occurs, the court must reverse without regard to prejudice to the

defendants." *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir.1980).

We agree that the government's actions in this case were highly irresponsible and share in the district court's vigorous condemnation of it. The court below found that Mrs. Hammond was not a willing witness in behalf of the government but no where in the record do we find, other than in her affidavit mentioned above,[3] whether she, in truth and in fact, would have been a willing witness in behalf of her husband or what her testimony was to be. We are unable, however, to apply a per se rule of reversal in this case.

Recent decisions of the Supreme Court lead us to conclude that a conviction may not be overturned under a per se reversal rule in cases involving *constitutional* due process violations of the kind in issue. In *Delaware v. Van Arsdall*, —— U.S. ——, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Court held that a state trial court's prohibition of all cross-examination by defense counsel of a state witness concerning that witness' possible bias in testifying for the state, though a violation of the Sixth Amendment's Confrontation Clause, did not require an automatic reversal of the defendant's conviction. "[T]he constitutionally improper denial of a defendant's opportunity to impeach a witness of a bias, like other Confrontation Clause errors," is subject to the harmless error analysis of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). 106 S.Ct. at 1438. The Court, recognizing that the Constitution entitles a criminal defendant to a fair trial, not a perfect one, *see United States v. Hasting*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983),

---

3. In its Order of October 21, 1985, the district court stated that "[t]he emotional distress which has inured to Mrs. Hammond, as well as her family, [from the government's conduct] are immeasurable." Mrs. Hammond, in her affidavit of October 8, 1985, described the effect of the government's conduct as follows:

I was ready to collapse—physically and mentally. I was in absolutely no shape to return to El Paso, be with my husband, *and offer evidence in his behalf.* To this day I have not recovered from the shock of the experience.

At no time did the agents let me know that I was not in their custody, and fully so. My children believed the same as I, that quite simply, we had no choice.

But for the experience I set out here, I would have gone to El Paso on Wednesday during his trial, as I had agreed and planned with my husband to do. After the experience set out here, for quite some while, I was emotionally unable to go to El Paso or anywhere else. (Emphasis added).

thus, emphatically rejected automatic reversal without regard to whether the error was prejudicial or harmless beyond a reasonable doubt. 106 S.Ct. at 1436–38.

In another habeas corpus decision handed down this term, the Court addressed the constitutional effect of a state prosecutor's improper remarks during closing argument on a defendant's murder trial. While agreeing that the prosecutor's argument deserved the condemnation it received, the Court noted that "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'." *Darden v. Wainwright,* — U.S. ———, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). The Court held that the prosecutor's argument did not deprive the defendant of a "fair trial." 106 S.Ct. at 2472.

The federal prosecution in the case at bar, in turn, involves the government's interference with Hammond's right to call his wife as a witness on his behalf.[4] Under the guidelines of *Darden* and *Van Arsdall,* the relevant constitutional inquiry becomes whether the prosecutor's conduct was sufficiently egregious in nature and degree so as to deprive Hammond of a fair trial. It could also implicate whether, aside from the constitutional issue, an exercise of the court's supervisory power is required. Neither issue is subject to a per se disposition. Both issues require that the district court further develop the extent and effect of the prosecutor's conduct.

 Hammond contends that the government's conduct prejudiced his defense by depriving him of his wife as a witness on his behalf and as a source of support during the trial, by the resulting trauma or anxiety which he experienced upon learning that his family had been taken into custody, and by the prosecutor's exploitation of Mrs. Hammond's absence. We do not take issue with the psychological impact on the Hammonds from the government's conduct. However, Hammond has not shown, on appeal or at trial below, how his wife's testimony would have affected the jury's assessment of the evidence.

While the record would support the conviction of Hammond, we have to consider that the first jury that tried him failed to reach a verdict. It might be that the testimony of Mrs. Hammond, if she were to have testified would have tipped the scales in behalf of Hammond, resulting either in Hammond's exculpation or another mistrial.

A reading of the record made when the court below interviewed Mrs. Hammond, after which the court had decided that Mrs. Hammond was not a willing witness for the government and that she had never been advised of her right as the spouse of defendant Hammond not to testify, discloses that the court ordered a marshal to take Mrs. Hammond and her children back to Odessa. We gather from the record before us that after he had ordered Mrs. Hammond taken back that he informed counsel of his actions. The government urges that counsel for defendant Hammond should have requested that Mrs. Hammond remain available to testify in behalf of her husband. We cannot tell from the record if they had this opportunity. Neither does the record show that at any time the court below ever inquired whether Mrs. Hammond was willing to testify for her husband.

Even though Hammond had requested an evidentiary hearing on the extent and

---

**4.** In *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967), the Supreme Court compared the rights of an accused under the Confrontation Clause with the right to present a defense:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his witnesses to establish a defense. This right is a fundamental element of due process of law.

effect of the misconduct of the government, the court below in a terse order stated that the motion for mistrial, which included the allegations of prosecutorial misconduct and the allegations that Mrs. Hammond was kept from testifying, was without merit.

Because we do not consider that the motion for new trial based on what happened to Mrs. Hammond was without merit, we are remanding this case to the court below to conduct an evidentiary hearing to determine whether or not Mrs. Hammond, except for the actions of the government, would have indeed testified for her husband and that her testimony would have had any effect on the jury verdict. Also, whether the action of the government towards Mrs. Hammond prejudiced defendant Hammond in any other way as to make his trial unfair.

## IV.

### EXCLUSION AND ADMISSION OF EVIDENCE

■ Hammond contends that the district court erred in preventing three county officials from testifying that John Peterson had engaged in a pattern of falsely accusing county officials of criminal conduct. In addition, Hammond and Weddell argue that the court erred in admitting testimony that a minor fire, occurring in September, 1981, had been the result of arson. According to Appellants, admission of this evidence violated the trial court's own Orders and Fed. R.Evid. 404(b).

It is well settled that the admissibility of evidence rests within the sound discretion of the trial court; the court's rulings, therefore, may not be disturbed absent an abuse of discretion. *See Petty v. Ideco*, 761 F.2d 1146, 1150–51 (5th Cir.1985). Our review of the record reveals that the court excluded the county officials' testimony as impeachment on a collateral matter and admitted testimony of the September, 1981, fire in rebuttal to defense evidence that the fire was electrical in orgin. We conclude, therefore, that the district court did not abuse its discretion in its evidentiary rulings.

## CONCLUSION

In summary, we conclude that the evidence is sufficient to support Weddell's convictions for conspiracy and aiding and abetting the commission of arson in violation of 18 U.S.C. §§ 844(i), 371 and 2. We further hold that the district court did not abuse its discretion in fixing the place of trial in El Paso, or in the exclusion and admission of evidence during Appellants' trial. Moreover, we also find that all errors complained of by defendant Hammond cannot be sustained except as to the issue of whether the government's misconduct toward Mrs. Hammond prejudiced Hammond's defense or rendered his trial unfair.

The case of defendant Hammond is held in abeyance until the court below conducts the hearing herein requested. On the constitutional issue, the court should determine whether the conduct of the government was harmless beyond a reasonable doubt. If that finding cannot be made, the extent of prejudice should be developed so that the court can determine whether the prejudice deprived Hammond of a fair trial or should be the subject of the supervisory power of the court. If after conducting such hearing the court below should decide that the conduct of the government towards Mrs. Hammond did not prejudice the defense of defendant Hammond, the court should set out its reasons for such findings so that defendant Hammond will have an opportunity to return to this court by filing a record of the hearing hereby ordered together with an order denying defendant Hammond a new trial.

CONVICTION OF DEFENDANT WEDDELL AFFIRMED. CONVICTION OF DEFENDANT HAMMOND HELD IN ABEYANCE until after the hearing herein ordered is held and the district court has had an opportunity to decide whether or not a new trial should be ordered. We do not in any way intimate what the ruling of the court below on the issue should be.