UNITED STATES of America, Appellee,

v.

Barry HOFFMAN, Defendant,
Appellant.

No. 87–1080.

United States Court of Appeals,
First Circuit.

Heard Sept. 9, 1987.

Decided Nov. 6, 1987.

Constance L. Rudnick, Boston, Mass., with whom Richard A. Gargiulo, David M. Kozlow and Gargiulo & McMenimen, Boston, Mass., were on brief, defendant, for appellant.

Deborah A. Ramirez, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., Acting U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, GARTH,* Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

During the summer of 1985, the federal Drug Enforcement Administration (DEA) came to believe that a Boston-area liquor dealer, Joseph Gassiraro, was involved in the distribution of cocaine. The DEA sought and obtained a court order allowing electronic surveillance on three telephones used by Gassiraro, two at his place of business (the Orient Liquor Mart) and the third at his home. Intelligence gained from the continuing investigation (including the monitoring of the three telephones) led the DEA to seek similar access to a pair of coin-operated payphones located near the Orient Liquor Mart. After wiretaps had been placed on these instruments, the government overheard what seemed to be a suspicious and ongoing dialogue between Gassiraro and the defendant-appellant, Barry Hoffman. Not surprisingly, the investigation was expanded to bring Hoffman within its scope.

A federal grand jury eventually returned a twenty-one count indictment against Gassiraro, Hoffman, and others. The centerpiece of the indictment was a charge of conspiracy to possess cocaine with the intent to distribute the drug in violation of 21 U.S.C. §§ 841(a)(1), 846. The named defendants were accused of an assortment of related crimes. Most of them (Gassiraro included) pled guilty to one or more of the charges. Hoffman, however—as was his right—stood trial on the conspiracy count and on four counts of unlawful use of the telephones to facilitate the distribution of

* Of the Third Circuit, sitting by designation.

narcotics. *See* 21 U.S.C. § 843(b).[1] The jury found Hoffman guilty on all five of these charges. Following the imposition of sentence, he prosecuted this appeal. We find Hoffman's plea for reversal unavailing and affirm his conviction on all counts.

We see no benefit to be derived from an exegetic narration of the sordid facts of the criminal enterprise, as reflected by the trial record. Rather, we shall refer to factual material in our ensuing discussion only to the extent necessary to place the issues on appeal into proper perspective. Nor is there need to dwell overlong on self-evident truths; notwithstanding that we have considered the wide array of points which appellant raises, only three of them require any discussion. We simply note in passing that we have reviewed—and rejected—the remainder.

## I. PROSECUTORIAL INTERFERENCE WITH SIXTH AMENDMENT RIGHTS

At trial, the government presented evidence tending to prove that Hoffman, acting as a cocaine wholesaler, supplied Gassiraro (a dealer) with drugs on at least three occasions. One of those occasions formed the backdrop against which the charge of prosecutorial interference with Hoffman's right to present witnesses in his own defense matured. We examine the critical facts.

On July 24, 1985, Hoffman and Gassiraro spoke in code on tapped telephone lines. The government's translation indicated that, during the course of this conversation, Gassiraro ordered a quantity of cocaine and agreed to prepay by delivering money to Hoffman in Florida. Once his palm had been crossed with silver, appellant would arrange for the cocaine to materialize in Boston. The next morning, Gassiraro flew to Florida. He was met at the airport by Hoffman. Later that day, Gassiraro boarded a flight home. He was greeted at Boston's Logan Airport by Thais Gassiraro, his adult daughter. Soon after father and daughter left the airport, DEA agents stopped the car in which they were riding. A consensual search of the vehicle revealed half an ounce of high quality cocaine. Gassiraro claimed that the contraband did not belong to him; he said it had been "planted" in order to incriminate him. The government, on the other hand, contended that the package was a sample furnished to Gassiraro by Hoffman. From aught that appears of record, Thais had nothing to say—then or thereafter—as to the source of the discovered cocaine.

Between indictment and the time of trial, a gestation period of some nine months, the defendant took no meaningful steps to interview Thais Gassiraro or to lay the groundwork for her appearance as a trial witness. The record plainly indicates that, mid-trial, defendant's counsel entertained no thought of calling her. Yet, at the very end of the trial, perhaps grasping for straws in the face of overwhelming evidence of Hoffman's guilt, the defense decided to explore the subject further. And the prosecutor, an Assistant United States Attorney (AUSA), became apprised of this intention.

What happened next is admitted in part and disputed in part. We know that the AUSA placed a call to Henry Katz, Es-

---

**1.** The pertinent portions of the three statutes upon which the tried counts were founded read as follows:

   ... [I]t shall be unlawful for any person knowingly or intentionally—
   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; ....
  21 U.S.C. § 841(a)(1) (1982).
   Any person who attempts or conspires to commit any offense defined in this subchapter [dealing with narcotics offenses] is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
  21 U.S.C. § 846 (1982).
   It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of [felonious drug trafficking].... Each separate use of a communication facility shall be a separate offense.... For purposes of this subsection, the term "communication facility" ... includes mail, telephone, wire, radio, and all other means of communication.
  21 U.S.C. § 843(b) (1982).

quire. Katz was Joseph Gassiraro's attorney; the AUSA believed, mistakenly, that he also represented Joseph's daughter. There is substantial agreement that the prosecutor told Katz, in words or substance, that "if Miss Gassiraro testified that the cocaine found in her car on the 25th of July had been planted, ... the government would seek an indictment against [her] for perjury." The defendant alleges that an added threat was made, claiming that the AUSA admonished Katz to "[t]ell your client [Joseph Gassiraro] to tell his daughter [Thais Gassiraro] not to come in." [2] Katz, though he testified that he regarded what was said "not really [as a] threat of prosecution as much as ... an overreaction," brought the call to the attention of defense counsel. Hoffman moved for a mistrial, arguing that this overture had dampened his ability to produce Thais as a defense witness. The district court held an immediate hearing, listened to Katz's version of what had occurred, and denied the motion.

The defense, claiming to be unable to locate Thais, rested without presenting any testimony from her. (Parenthetically, it should be noted that, *before* the AUSA's call, the defense was equally in the dark as to Thais's whereabouts.) The jury found the defendant guilty. The district judge thereafter conducted a fuller hearing. Although he found the call to have been "careless" and "an extraordinarily foolish contact," he determined that the AUSA had engaged in no intentional misconduct. Based on the evidence, the judge felt unable to conclude "that there was a direct or even an indirect connection" between the disputed call and Thais Gassiraro's nonappearance at trial. Thus, in the court's view, there was no interference with any constitutionally protected right. And, notwithstanding that the court gave appellant the opportunity to reopen and to present evidence of causation—say, an affidavit

from Thais—Hoffman neither expanded the record nor moved for reconsideration.

We start our analysis of this point by acknowledging that the sixth amendment's guarantee of compulsory process has pertinence in these precincts. In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense.... This right is a fundamental element of due process of law.

*Id.* at 19, 87 S.Ct. at 1923. It is this right which appellant claims has been trammelled in his case. From his perspective, because he maintains that a violation of the right to present witnesses is *per se* reversible error, his conviction should be overturned without regard to matters such as causation or prejudice. Appellant's argument, however, misapprehends the nature of the inquiry into causation. Unless and until, as a threshold matter, it is determined that the sixth amendment was abridged, any question as to the appropriateness of harmless error analysis, *see generally United States v. Argentine*, 814 F.2d 783, 788–90 (1st Cir.1987), need not be posed. Causation—unlike prejudice—is an integral element of this threshold inquiry. It is an element which Hoffman falls well short of establishing on this record.

While *Washington v. Texas* shaped the broad contours of the right to compulsory process, and the later case of *Webb v. Texas*, 409 U.S. 95; 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), held that the right might be transgressed by impermissible governmental interference with a witness's decision to testify, *id.* at 98, 93 S.Ct. at 353, its precise dimensions remained murky. The lens of inquiry was narrowed, however, in *United States v. Valenzuela–Bernal*, 458 U.S. 858,

---

**2.** The AUSA denied making any such statement. Katz's testimony on the point was equivocal: when he initially related the discussion to the judge, he did not mention this aspect of the conversation. Subsequently, he testified that it had transpired, but had slipped his mind. The

district court saw no need to make an express finding on the matter. Nor do we. Whether or not the ill-advised admonition was voiced—and we in no way suggest that it was—it would not alter our resolution of this point.

102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982).[3] There, the Court stated that a bare negative was not enough; a defendant must exhibit "more than the mere absence of testimony" to establish a violation of the right to present witnesses. *Id.* at 867, 102 S.Ct. at 3446. There must be a plausible showing that the testimony was both material and favorable to the defense. *Id.* at 871, 102 S.Ct. at 3448. The Court strongly intimated that materiality and favorability, without more, would not suffice to establish a sixth amendment compulsory process defense; the contested act or omission must be attributable to the sovereign and must be causally related to the inability to present the evidence. *Id.* at 867, 102 S.Ct. at 3446. As we interpret the doctrine, an accused must, at a minimum, demonstrate some plausible nexus between the challenged governmental conduct and the absence of certain testimony.

*Webb v. Texas,* we think, illustrates the point. There, the trial judge badgered a defense witness concerning the penalties for perjury. 409 U.S. at 95–96, 93 S.Ct. at 352. The Court took pains to zero in on the causative link between the hectoring and the testimonial gap. The Court found:

> The fact that [the witness] was willing to come to court to testify in the petitioner's behalf, refusing to do so only after the judge's lengthy and intimidating warning, strongly suggests that the judge's comments were the cause of [the witness's] refusal to testify.

*Id.* at 97, 93 S.Ct. at 353. *Webb,* as we read it, implies the obverse: had the witness been unwilling to testify in petitioner's behalf all along, the judge's comments, though wrong, could not have been a causative factor.

■ We hold, therefore, that causation is an essential building block in the edifice of a sixth amendment claim of this genre. There can be no violation of the defense's right to present evidence, we think, unless some contested act or omission (1) can be attributed to the sovereign and (2) causes the loss or erosion of testimony which is both (3) material to the case and (4) favorable to the accused. Hoffman, while conceding the suitability of the first, third and fourth segments of this formulation, hotly contests the appropriateness of the second.[4] Yet, we find the caselaw which has trailed in the wake of the Court's decisions to be supportive of the causal connection requirement.

In *United States v. Weddell,* 800 F.2d 1404 (5th Cir.1986), the Fifth Circuit, absent evidence of causation, refused to overturn a conviction based upon alleged interference with a defense witness's desire to testify. *Id.* at 1412. Inasmuch as the issue had not been addressed below, the Court of Appeals remanded for an evidentiary hearing to determine "whether or not [the witness], except for the actions of the government, would have indeed testified for [the accused]." *Id. Weddell,* it seems,

---

**3.** The setting of *Valenzuela–Bernal,* to be sure, had somewhat different trappings. The case did not involve allegedly "improper" conduct by a prosecutor, as in the present matter, or by a judge, as in *Webb v. Texas.* But, the bedrock issue was much the same: whether the sovereign's conduct impermissibly interfered with the right to mount a defense. 458 U.S. at 871, 102 S.Ct. at 3448. The fact that the issue arose in the context of a congressionally mandated immigration policy (implicating the extent to which a defendant charged with carriage of illegal aliens had a right to have the aliens held in this country for possible use as defense witnesses instead of being deported immediately after the defendant's arrest) is not of decisive consequence. What matters most for the purposes at hand is that the Court in *Valenzuela–Bernal* highlighted a number of the considerations that enter into the calculus necessary to determine when government's contribution to a

defendant's inability to produce a witness runs afoul of the sixth amendment.

**4.** We decline appellant's invitation to adopt what he describes as a "prophylactic approach," *i.e.,* to rule that a presumption of causation attends the levelling of a charge of improper governmental tampering with the right to compulsory process. We think it not too onerous a burden to require that a defendant who asserts the affirmative of so serious a proposition lay enough cards face-up on the table that an inference of causation can properly be drawn. In our view, such a protocol parallels that employed by the Supreme Court in *Valenzuela–Bernal,* 458 U.S. at 871, 102 S.Ct. at 3448. If a claim of interference has any substantial merit, such a *prima facie* showing should not be difficult.

is staunch authority for a causal connection requirement.[5] Similarly, in *United States v. Silverstein*, 732 F.2d 1338 (7th Cir.), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1984), the Seventh Circuit found the lack of a sufficient causal nexus between official action and a witness's decision not to testify to be dispositive of the point. The governmental impropriety, although less egregious, was reminiscent of the interdicted conduct in *Webb:* the trial judge using too heavy a hand in warning a witness about the penalties of perjury. *Id.* at 1345. The court discerned that "it was not the fear of perjury charges that led [the witness] to step down," *id.*, and refused to disturb the conviction. To like effect is the decision in *United States v. Simmons*, 699 F.2d 1250 (D.C.Cir.1982). In that case the witness, for his own reasons and on advice of his counsel, elected to stand on the fifth amendment rather than to testify. The court ruled that prosecutorial threats had not deprived defendant of the witness's testimony. *Id.* at 1251–52. Therefore, the defendant's constitutional guarantees were not sullied. *Id.*

■ In order to prove a violation of his right to present a defense, then, appellant must first show that the AUSA's intemperate call to Katz was attributable to the government. Concededly, this was so. The next step requires Hoffman to show

that his inability to obtain Thais Gassiraro's testimony was caused by this behavior. It is on this step that he stumbles.

We must accept the district court's finding on the issue of causation unless it is clearly erroneous. *See Obolensky v. Saldana Schmier*, 409 F.2d 52, 54–55 (1st Cir.1969) (in civil negligence suit, clear error standard governs review of finding of causation). *Cf. United States v. Figueroa*, 818 F.2d 1020, 1024 (1st Cir.1987); *United States v. Patterson*, 644 F.2d 890, 894–95 (1st Cir.1981). Appellant must therefore persuade us that the finding had no reasonable support. Given the facts which emblazon the record of this case, the task is an insuperable one.

First and foremost, there was not a scintilla of proof that Thais Gassiraro ever learned of the telephone call to Attorney Katz. To the exact contrary, counsel for both Joseph Gassiraro and for Hoffman testified that they had not communicated with Thais in the aftermath of the prosecutor's soliloquy. Although the substance of the conversation was related to Joseph Gassiraro, there was not the slightest indication that he spoke to his daughter about it or otherwise discouraged her availability because of some real or fancied prosecutorial intimidation.[6] Appellant's desire to use Thais as a witness burned with a flickering flame at best, and his efforts to produce

---

5. Appellant suggests that the later decision in *United States v. Viera*, 819 F.2d 498 (5th Cir. 1987), diminishes the vigor of *Weddell*. We diagnose no such malaise. In *Viera*, the prosecutor added insult to injury by rashly scaring off a prospective defense witness and then commenting to the jury, in summation, about defendant's failure to produce the very same witness. A divided Fifth Circuit panel found a sixth amendment compulsory process violation, which, when combined with the "aggravating [rhetorical] error," necessitated reversal of Viera's conviction. 819 F.2d at 504 & n. 4. In *Viera*, unlike this case, prejudice was the issue; causation had been established. *See id.* at 502 ("Because of the [prosecutor's] threats, appellant and his lawyer decided not to call [the witness] to the stand."). The *Viera* majority chose to distinguish *Weddell*, without purporting to retreat from it in any way. *Id.* at 504 n. 4. Finally, the status of the panel decision in *Viera* is fraught with uncertainty. The Fifth Circuit has lately agreed to rehear the case en banc. *See* 828 F.2d 2 (5th Cir.1987) (en banc).

6. To be sure, Joseph entertained doubts—both before and after the AUSA's call—as to the desirability of volunteering his daughter as a witness. Uncontradicted evidence showed that he was "concerned" about the possibility of such an appearance because Thais was "high strung" and "nervous." Such paternal concerns, of course, do not implicate misconduct attributable to the sovereign. Moreover, the suggestion that Joseph himself felt threatened by the call (because he had yet to be sentenced on his guilty plea) leads nowhere. The critical determination is not whether Joseph was affected, but whether—directly or indirectly (through Joseph, for example)—Thais was affected. There was no evidence of any such spillover effect. Furthermore, *Joseph* never claimed that he felt menaced; nor was there any reason for him to feel insecure. The prosecution, as part of its plea agreement with him, was committed to its sentencing recommendation well before the events at issue occurred.

her as a trial witness were considerably less than diligent. In roughly 239 days which elapsed between the original indictment and the start of trial, Hoffman made few (if any) attempts to pinpoint the whereabouts of Thais Gassiraro. During trial, he made but one documented attempt to locate her for a voluntary interview. He never sought a subpoena to compel her testimony. He never sought a trial continuance so that he might find her. All in all, the record belies any serious commitment to running Thais Gassiraro to ground.

The sum and substance of what was before the district court plainly indicated that Thais Gassiraro, if burdened with relevant knowledge at all, was but peripherally involved with the events at issue. To this date, there has been no concrete indication that she possessed information helpful to the defense. From aught that appears, Thais was, in terms of this case, more pigwidgeon than protagonist. Indeed, she had never been asked to testify at Hoffman's trial and had not agreed to do so. To attribute her nonappearance, then, to the AUSA's shot from the hip—or, more precisely put, the AUSA's shot from the lip—requires a leap of faith unsupported by reason or logic. The district court, faced with a dearth of evidence suggesting any causal nexus whatever between Thais's absence from the trial and the prosecutor's ill-advised call to Katz, was well inside its proper province in concluding that other reasons—say, Hoffman's own lack of diligence, Joseph's concern for his daughter's health, Thais's desire for anonymity, her lack of relevant or helpful knowledge, the fact that the defense never intended to offer her testimony—led to, and caused, the appellant's failure to recruit Thais Gassiraro for the witness stand.

We hold that the district judge had an ample evidentiary predicate for concluding that the AUSA's (mis)conduct, if misconduct it was, did not interfere with the defendant's rights under the sixth amendment.[7] This being so, we need not reach the series of more removed questions—such as the applicability of a *per se* rule or the existence *vel non* of prejudice—which could only be triggered by some actual interference with the constitutionally protected right. The district court's refusal to grant a mistrial or to vacate Hoffman's conviction on sixth amendment grounds was not clearly erroneous.

## II. SUPPRESSION OF THE INTERCEPTS

We turn next to appellant's unsuccessful attempts to suppress the government's most damning evidence against him—the contents of his seven recorded telephone conversations with Joseph Gassiraro. Hoffman's assault on the legality of this operation is a many-splendored thing, involving several distinct lines of attack. We treat these in three brief segments.

*A. Probable Cause.* The appellant urges that there was no probable cause to support the issuance of *either* of the interception orders. More particularly, appellant argues that the affidavit of Stephen Assarian (presented to the district judge on June 13, 1985) did not establish probable cause to believe that Gassiraro's three telephones—his home telephone and the two located at the Orient Liquor Mart—were being used to advance a criminal conspiracy; and further, that the supplemental affidavit authored by Assarian's fellow DEA agent (Doherty), which was filed on July 17, 1985, was likewise impuissant as a foundation for electronically monitoring the two nearby pay telephones.

We see no good reason to tarry long over these baleful lamentations. "Probable

---

**7.** In this case, the AUSA's actions, while better omitted, were borderline at worst. The district judge, supportably we think, found that any misconduct was not deliberate. We leave for another day the question of whether a sufficiently egregious misstep by a prosecutor may—even in the absence of causation—require us to use our supervisory powers and reverse a conviction to deter future prosecutorial trespasses.

See, e.g., *United States v. Mora,* 821 F.2d 860, 869 (1st Cir.1987) ("unwholesome prosecutorial zeal" may justify suppression of wiretap evidence to teach government a needed lesson); *United States v. Farnkoff,* 535 F.2d 661, 668 n. 17 (1st Cir.1976) ("prosecutorial indiscretions" in closing argument may necessitate new trial as a means of deterrence).

cause" need not be tantamount to "proof beyond a reasonable doubt." As we have recently observed:

Probable cause is determined under an objective standard, and the government need not show "the quantum of proof necessary to convict." Probability is the touchstone: "[p]robability, and not a prima facie showing of criminal activity is the standard of probable cause."

*United States v. Figueroa*, 818 F.2d at 1023–24 (citations omitted). *Accord United States v. Wiseman*, 814 F.2d 826, 828 (1st Cir.1987).

Having these teachings in sharp focus, we have carefully scrutinized both Assarian's forty page affidavit and Doherty's twenty-nine page affidavit. These documents bear the imprimatur of agents specially trained in the ways of drug trafficking, a factor which the district court was entitled to weigh in the balance. *Figueroa*, 818 F.2d at 1024; *United States v. McHugh*, 769 F.2d 860, 865 (1st Cir.1985). The papers were replete with solid information, information which bore staunch, self-contained indicia of reliability. To be sure, some of the data dealt with historical matters of background interest. But taken as a whole and in the vibrant context of ongoing events, the material had adequate relevance to the present that it could not fairly be written off as stale or obsolescent.

■ The district court found that the initial application demonstrated probable cause sufficient to allow the original intercepts. In so ruling, the court gave considerable weight to the agents' use of three separate informants, all thought reliable. Two of them had seen Gassiraro with large quantities of cocaine. One had purchased cocaine from Gassiraro over a period of time. Another knew him to have been enmeshed in the drug trade for a decade or more. The tales of Gassiraro's continuing involvement in the business were cross-corroborated—a fact rendered the more impressive because the trio of informants operated independently of each other; none of them knew of the roles which the others were playing. The second application—the

application for permission to tap the two payphones—brooks no reasonable doubt as to adequacy. Doherty's affidavit recounted, *inter alia*, incriminating conversations which had been obtained in the course of the previously-sanctioned monitoring of Gassiraro's telephones. The district judge found the resultant showing of probable cause to be more than adequate.

We need dwell on this point no more. We can review findings such as the district court essayed in this case only for clear error, *Figueroa*, 818 F.2d at 1024; *Wiseman*, 814 F.2d at 827–28, and we spy none here. The affidavits limned a thoroughly convincing picture of a major interstate drug ring at work, employing telephonic means at the specified locations. The district court, in noticing probable cause, appears to have been clearly right.

■ B. *Less Intrusive Means*. Appellant's next sally is equally unavailing. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1982), declares that a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). In Hoffman's view, the DEA's litany of its pre-interception efforts failed to measure up to this standard. The district court was not convinced by this argument. Nor are we.

Section 2518(1)(c) must, of course, be read in the light of reason. Plainly, the law was not meant to force the government to run outlandish risks or to exhaust every conceivable alternative before seeking a wiretap. *See, e.g., United States v. Almonte*, 594 F.2d 261, 264 (1st Cir.1979); *United States v. Gerardi*, 586 F.2d 896, 897–98 (1st Cir.1978). The basis for the statutory monition is the salutary notion that the sovereign should make a reasonable, good faith effort to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic

interception of telephone calls.[8] In short, in a society which values privacy and the rights of the individual, wiretapping is to be distinctly the exception—not the rule.

In this case, there was a satisfactory showing of antecedent efforts. Confidential informants were used extensively, but proved to be of limited assistance. Fear of physical harm on the part of various persons impeded the hunt. Access to the federal witness protection program was offered and rejected. Agents were assigned to the case in adequate numbers. Visual surveillance was tried, but was inconclusive. (Given the neighborhood where Gassiraro's home and the Orient Liquor Mart were situated, and Gassiraro's roots in that neighborhood, it was virtually impossible for watchers to remain inconspicuous.) Pen registers were utilized and telephone toll records were analyzed. These, and other steps documented in the record, were enough, we think, to insure that the DEA did not seek to "resort[ ] to [wiretapping] in [a] situation[ ] where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).

As we see it, the district court did not err in authorizing the interceptions to begin. In this wise, it is not without significance that the suspects in this case had exhibited considerable craftiness, circumspection, and caution, thereby increasing the difficulty of investigation logarithmically. Having tested the government's recital of its pre-existing investigatory endeavors in the requisite "practical and commonsense manner," *United States v. Scibelli*, 549 F.2d at 226, and having measured those endeavors against the guardedness of the gang, we do not find the antecedent efforts wanting.

█ C. *Minimization.* The final arrow in appellant's electronic evidence quiver targets the imperative of another safeguard which Congress inserted into Title III, namely, the proviso that all electronic listen-ins "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). This minimization requirement spotlights the interest in confining intrusions as narrowly as possible so as not to trench impermissibly upon the personal lives and privacy of wiretap targets and those who, often innocently, come into contact with such suspects. Hoffman contends that, in this case, government agents consciously and flagrantly disregarded this portion of the statute and the district court's ensuing minimization order. Moreover, appellant's thesis runs, such conduct constituted an unreasonable search which stained the wiretap investigation beyond hope of cleansing, thus necessitating suppression of all the harvested fruits.

The district court did find some evidence of fribbling excesses in this regard, and suppressed twenty-two calls which Mrs. Gassiraro had made to her attorney on a telephone line which serviced the residence she and Joseph shared. As to these conversations, the court determined that the DEA had gone beyond the bounds of reasonable latitude; the agents should have stopped listening to each call as soon as the parties were identified. Nevertheless, the court refused to quash proof of the contents of the other (properly intercepted) calls.

In our view, the district court was patently correct. Although surveillance of the twenty-two personal calls placed by Mrs. Gassiraro—a person not herself suspected of participation in the criminal enterprise—should have been ended more abruptly,[9] there was no taint upon the investigation as a whole sufficient to warrant the sweeping relief which Hoffman urges. We will not jettison the baby with the bath water. The minimization effort, assayed in light of

---

8. We have previously compiled a representative sampling of the sort of techniques which we believe might be encompassed under the rubric of "[n]ormal investigative procedure," *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.), *cert. denied*, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977), and it would be pleonastic to set forth that list anew.

9. The government has conceded that these calls were the merest of buzznacking: innocent and wholly unrelated to the suspected criminality.

the totality of the circumstances, was managed reasonably. We sketch the guidelines.

*Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), is the touchstone for any reasoned discussion of the issue of minimization. In *Scott*, the Court concluded that compliance with a minimization order must address the reasonableness of the interceptor's conduct. *Id.* at 139, 98 S.Ct. at 1723. As the *Scott* Court readily recognized, such a compliance determination is "necessarily ad hoc". *Id.* "[T]here can be no inflexible rule of law which will decide every case." *Id.* The facts and circumstances of the particular investigation, then, comprise a critical integer in the minimization equation. *Id.* at 140, 98 S.Ct. at 1724. With these precepts in mind, we gauge the DEA investigation at issue.

From DEA's point of view—reasonably held, we might add—Joseph Gassiraro and the Orient Liquor Mart were thought to be part and parcel of a sizable drug ring. Where, as here, an investigation is focused largely on blueprinting the shape of the conspiratorial wheel and identifying the spokes radiating from its hub, the need to allow latitude to eavesdroppers is close to its zenith. The need is but heightened because the conspiracy involves controlled substances—easily concealed, easily transported, likely to implicate international or at least interstate interests. As the Seventh Circuit observed in *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir.1975): "(l)arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode."

Here, too, the participants used coded language, *see infra* Part III, another factor which militates strongly in favor of added leeway. *See Quintana*, 508 F.2d at 874–75 n. 6. When the opposition speaks in tongues, there is greater need to listen longer and more closely to conversations which may seem innocuous at first. Moreover, the district court required, received, and reviewed weekly progress reports on the course of the electronic surveillance.

Such prophylaxis not only enhanced the reliability of ongoing government minimization endeavors, but afforded additional evidence of DEA's good faith effort at compliance. *See id.* at 875. Given that the agents in fact timely withdrew from nonrelevant calls which were long enough to require minimization, it cannot plausibly be concluded that the DEA's minimization campaign was an arbitrary or capricious one. Reasonableness, after all, is not a constant; "as Emerson said of nature, reasonableness 'is a mutable cloud, which is always and never the same.'" *Sierra Club v. Secretary of the Army*, 820 F.2d 513, 517 (1st Cir.1987). And the attempt to screen irrelevancies and to protect personal privacy interests, as managed by the DEA in this instance, passed muster. *Compare Quintana*, 508 F.2d at 873 (cataloging cases finding minimization reasonable notwithstanding uninterrupted interception of all calls).

That the district court saw fit to suppress the contents of several calls as improperly minimized does not alter this conclusion. *Scott* requires reasonableness in the context of the entire wiretap, as opposed to a chat-by-chat analysis. 436 U.S. at 140, 98 S.Ct. at 1724. "The statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversation." *Id.* We recognize that *Scott* contains language suggesting that once a pattern of innocent calls is established, it is unreasonable to listen to calls falling into that pattern:

> During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls.... Interception of those same types of calls might be unreasonable later on, however, once the nonpertinent categories have been established and it is clear that this particular conversation is of that type.

*Scott*, 436 U.S. at 141, 98 S.Ct. at 1725. *See also Quintana*, 508 F.2d at 874 ("If the agents learn from this initial interception of calls that there is a pattern of innocent conversations, then they should

cease eavesdropping on that group for the remainder of the tap."). Nonetheless, this admonition is of no avail to Hoffman, for none of the conversations inculpating him fell into any such pattern. In the first place, the twenty-two telephone calls between Mrs. Gassiraro and her lawyer did not in any way concern the appellant. In the second place, none of the calls which were used against Hoffman involved either Mrs. Gassiraro or her counsel. In the third place, the excluded calls were, without exception, placed on Gassiraro's home telephone. There is nothing to suggest that Hoffman ever used that telephone, or ever called that number. Certainly, the sanctioned surveillance never uncovered appellant talking over that line.

The conclusion is inescapable. Even if the district court suppressed the twenty-two calls not merely for irrelevancy, but because they formed part of a pattern of innocent calls which should not have been surveilled, the prosecution of this defendant was unaffected. It is too much of a stretch to brand Hoffman's conversations as a part of that pattern. And, the suggestion that total suppression must be ordered to forestall future misconduct—because the agents acted in such blatant and egregious disregard of the minimization order that no lesser sanction will serve—is doubly flawed. First, there is no principled way to categorize the agents' conduct in this case as deserving of the invective which appellant has heaped upon it. As we have pointed out, by and large, the electronic surveillance was managed reasonably. Second, we are not faced with deciding whether, in a particularly horrendous case, total suppression may be, as the Ninth Circuit has indicated, an "appropriate" solution. *United States v. Turner*, 528 F.2d 143, 156 (9th Cir.), *cert. denied*,

423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975). The case at bar is not built to such a last. *Cf. United States v. Donovan*, 429 U.S. 413, 432–34, 97 S.Ct. 658, 670–71, 50 L.Ed.2d 652 (1977) (not every violation of the wiretap statute requires suppression of the resultant evidence); *United States v. Chavez*, 416 U.S. 562, 574–75, 94 S.Ct. 1849, 1855–56, 40 L.Ed.2d 380 (1974) (same). Nothing in the implementation of these wiretaps demanded—or warranted, for that matter—so drastic a remedy. Whatever errors the government may have made in the course of minimization were, we think, adequately compensated by the suppression of the twenty-two calls themselves.

██ We rule, accordingly, that the government's electronic surveillance was duly authorized; that, insofar as it affected the defendant's substantial rights, it was lawfully conducted; and that its fruits were properly admitted into evidence against Hoffman at his trial.[10]

## III. DECRYPTING THE DIALOGUE

The final issue which warrants even brief mention entails the district court's allowance of certain expert testimony proffered by the prosecution. The genesis of this controversy stems from the seven intercepted conversations between Hoffman and Joseph Gassiraro. Those discussions contained cryptic allusions—largely in the idiom of the vineyard—which the government maintained were coded negotiations for the purchase and sale of cocaine. The United States presented a DEA agent, Assarian, to clarify the meaning of the conversations. The district court permitted the testimony as expert opinion pursuant to Rule 702 of the Federal Rules of Evidence.[11] The appellant assigns the admission of this decrypting evidence as error. We think otherwise.

---

**10.** Our conclusions in this regard render it unnecessary for us to consider the appellee's alternative argument: that, because Hoffman was overheard speaking only on coin-operated public telephones, he was not an "aggrieved person" within the purview of 18 U.S.C. § 2510(11) and had no standing to contest the admissibility of the conversations to which he was a party. Thus, we reserve the question of standing for some future case and day.

**11.** The text of Fed.R.Evid. 702 reads as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ A district court has broad discretion in the decision to admit or exclude expert testimony. *Allied International, Inc. v. International Longshoremen's Ass'n*, 814 F.2d 32, 40 (1st Cir.1987); *United States v. Wilson*, 798 F.2d 509, 517 (1st Cir.1986); *United States v. Systems Architects, Inc.*, 757 F.2d 373, 377 (1st Cir.), *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 115 (1985). That same latitude extends to determinations as to whether or not a proffered "expert" is sufficiently well qualified to speak to the subject matter. *Marshall v. Perez Arzuaga*, 828 F.2d 845, 851 (1st Cir.1987); *Garbincius v. Boston Edison Co.*, 621 F.2d 1171, 1174 (1st Cir.1980); *Mercado v. Wollard Aircraft Equipment, Inc.*, 574 F.2d 654, 655 (1st Cir.1978). The trial judge has a hands-on familiarity with the nuances of the case—nuances which may not survive transplantation into a cold appellate record. Thus, the district court's assessment of what will or will not assist the jury is entitled to considerable deference in the Rule 702 milieu.

■ In the case at bar, there was reliable evidence that Hoffman and Gassiraro spoke in a code, for example, using terms such as "six cases of wine" to connote "six kilograms of cocaine." The district court found that Assarian possessed "specialized knowledge" anent the drug trade such as would assist the jury in deciphering the intercepted conversations, both as to the coded terminology and as to the more conventional argot of narcotics traffic (*e.g.*, defining words such as "rock" and "fluff"). Therefore, Assarian was allowed to state his opinion as to the meaning of these otherwise obscure phrases.

We cannot say that this was error. Expertise is not necessarily synonymous with a string of academic degrees or multiple memberships in learned societies. Assarian was a veteran DEA agent who had worked in law enforcement for some twelve years, much of it as a narcotics agent. He had participated in hundreds of investigations. He had specialized police training and extensive practical experience in the field. To be sure, he had written no texts and had no formal schooling in the cocaine trade. But, hard-core drug trafficking scarcely lends itself to ivied halls. In a rough-and-ready field such as this, experience is likely the best teacher. *Cf. Grain Dealers Mutual Insurance Co. v. Farmers Union Cooperative Elevator and Shipping Ass'n*, 377 F.2d 672, 679 (10th Cir.1967) (construction man familiar with grain elevators allowed to testify as to cause of damage to elevator; court stated that "[p]ractical experience may be the basis of qualification"). Under these circumstances, permitting a street-wise savant such as Assarian to voice his opinions did not amount to an abuse of discretion.

We find, too, that the subject matter lent itself sufficiently well to expert testimony. Lay jurors cannot be expected to be familiar with the lexicon of the cocaine community. Several courts have held that, in the trial judge's discretion in an appropriate case, interpretation of codes and jargon used in the drug trade can be supplied through one experienced in the field. *See, e.g., United States v. Cirillo*, 499 F.2d 872, 881 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *United States v. Dawson*, 556 F.Supp. 418, 423 (E.D.Pa.1982), *aff'd*, 727 F.2d 1101 (3d Cir. 1983); *Cf. United States v. Riccobene*, 709 F.2d 214, 230 (3d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983) (FBI agent allowed to define phrases such as "La Cosa Nostra," "capi," and "consigliere"). We agree. Mindful that the jurors were told that Assarian's opinion evidence, like all opinion evidence, was not binding upon them, we believe that its admission cannot seriously be faulted.

## IV. CONCLUSION

In the last analysis, appellant's sundry importunings cannot withstand scrutiny. Notwithstanding that his arguments have been advanced with the force and fire of molten lava, they amount, in the end, to little more than volcanic ash.

The prosecution did not materially interfere with Hoffman's constitutionally protected right to present witnesses in his defense. The wiretaps which the government set in motion were duly authorized

upon probable cause and after other (less intrusive) investigative means had been effectively exhausted. The DEA agents' efforts to accomplish minimization were reasonable under the totality of the circumstances. There was no valid basis for suppression of appellant's intercepted conversations. The district court did not exceed its discretion in allowing a senior DEA agent, Assarian, to testify as an expert as to the strange linguistics employed by the conspirators. And, as we remarked at the outset, *see* text *supra* at 1301, Hoffman's remaining assignments of error are uniformly meritless.

We need go no further. The appellant was fairly tried and justly convicted. The judgment below must therefore be

*Affirmed.*