[NOT FOR PUBLICATION]

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 95-2277

 UNITED STATES,

 Appellee,

 v.

 LUIS A. RODRIGUEZ-CARMONA,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Salvador E. Casellas, U.S. District Judge] 

 

 Before

 Selya, Boudin and Lynch,
 Circuit Judges. 

 

Luis A. Rodriguez-Carmona on brief pro se. 
Guillermo Gil, United States Attorney, Warren Vazquez, Assistant 
United States Attorney, and Jose A. Quiles Espinosa, Senior Litigation 
Counsel, on brief for appellee.

 

 March 26, 1997
 

 Per Curiam. After a jury trial, appellant Luis 

Rodriguez-Carmona was convicted of aiding and abetting the

importation and possession of heroin with intent to

distribute in violation of 21 U.S.C. 841(a), 952, and 18

U.S.C. 2. He was sentenced to sixty-three months'

imprisonment and five years of supervised release.

Proceeding pro se on appeal, appellant seeks to overturn his 

conviction due to alleged prosecutorial misconduct and

ineffective assistance of defense counsel. We affirm the

conviction, but we decline to reach appellant's ineffective

assistance of counsel claims.

 I.

 Because appellant does not challenge the sufficiency of

the evidence, we provide a neutral summary of the evidence to

enable us to determine whether the events about which

appellant complains on appeal were harmless or prejudicial.

See, e.g., United States v. Morla-Trinidad, 100 F.3d 1, 2 

(1st Cir. 1996); United States v. Hardy, 37 F.3d 753, 755 

(1st Cir. 1994). 

 Acting in response to an intelligence alert, two U.S.

Customs inspectors identified appellant and Edward Iba ez

Cosme (Iba ez), when they arrived at Puerto Rico's Luis Mu oz

Mar n International Airport on a flight from Caracas,

Venezuela. Upon inquiring where he should go to clear

customs, Iba ez was taken for a secondary inspection. During

 -2-

the course of this inspection a customs inspector performed a

pat-down search and identified something concealed in

Iba ez's crotch. When instructed to lower his pants, Iba ez

stated, "me mangaste, you caught me" and revealed a package

containing 36 pellets of heroin similar to those often

swallowed by drug smugglers. Iba ez was immediately arrested

and given the Miranda warnings. He told the customs 

inspectors that he was travelling alone and that the drugs

belonged to him. 

 After the heroin had been found on Iba ez, a senior

customs inspector took appellant to a secondary inspection

area for questioning and examination of his luggage. Seven

Western Union money transfer receipts bearing appellant's and

Iba ez's names were found in appellant's bag, five of which

had been signed by Iba ez. Although appellant had initially

stated that he was travelling alone, when questioned further

he said that Iba ez had given him the receipts. Appellant

was also placed under arrest and taken with Iba ez to a local

hospital for x-rays, which proved negative.1 1

 Appellant and Iba ez were both indicted on drug

trafficking charges. Shortly before trial, Iba ez entered

into a plea agreement. He thereafter became the government's

star witness at appellant's trial. After acknowledging the

  

 1At the hospital, Iba ez encountered a male acquaintance 1
and told him that he had been caught drug trafficking.

 -3-

plea agreement, which was admitted into evidence, and the

fact that he could be prosecuted for perjury if he failed to

tell the truth, Iba ez testified at some length about his

past criminal exploits - without objection from defense

counsel.2  2

 Iba ez then described two smuggling ventures that he

claimed to have undertaken on appellant's behalf. In the

first such venture, Iba ez and a friend went to Venezuela to

procure a heroin sample for appellant. As the return flight

to Puerto Rico was delayed, appellant wired Iba ez money so

that he and his friend could fly to Puerto Rico first class.

Iba ez identified one of the Western Union receipts that had

been found in appellant's luggage as the receipt for the

funds that had been used for the return plane tickets on that

occasion. He claimed that he delivered 10 pellets of heroin

to appellant as a result of this trip. Iba ez testified that

the heroin that he delivered to appellant was supplied by a

  

 2The prosecutor first elicited Iba ez's criminal record, 2
which included convictions for theft of a toolbox, auto
theft, and contempt. In an effort to minimize the risk of
impeachment on cross-examination, the prosecutor next
required Iba ez to describe his criminal activities that had
not resulted in convictions. Iba ez then testified that he
had transported drugs to Spain via Puerto Rico the preceding
November and that he had participated in an elaborate
escapade which included a hold-up of a gas station, an
ensuing shoot-out, hit-and-run, carjacking, and automobile
crash, after which Iba ez and his cohorts eluded the police
by escaping through a waterfall. While the trial judge twice
convened bench conferences to question the relevance of this
testimony, defense counsel raised no objection to it. 

 -4-

Colombian, Cesar Augusto Buendia, and that the remaining

Western Union receipts found in appellant's luggage reflected

drug payments that appellant had made to Buendia.3  3

 With regard to the second smuggling venture, which

resulted in the arrests of Iba ez and appellant, Iba ez

testified that he recruited his cousin Jose Iba ez (Jose) to

assist in carrying the drugs but that Jose did not have a

passport. As a result all three men - appellant, Iba ez, and

Jose - travelled to Connecticut to secure passports so that

they could travel to Venezuela and return carrying drugs to

Puerto Rico.4 Because Iba ez informed the passport agency 4

that the three were scheduled to travel to Venezuela very

soon, the agency issued the men passports on the very day

that they applied for them. The three then returned to

Puerto Rico and left for Venezuela on March 22, 1995.

 Iba ez related that after staying in Venezuela briefly

the three men travelled to Colombia and checked into a hotel

in accordance with the instructions of their supplier,

Buendia. Eventually, Buendia caused the heroin to be

delivered to appellant's hotel room, where Iba ez washed the

pellets and divided them into two packages. According to

  

 3Iba ez described how appellant sent him to Western Union 3
on multiple occasions to wire money to Buendia. 

 4Iba ez testified that it was necessary to travel to 4
Connecticut, where Jose had been born, to secure Jose's birth
certificate for his passport application.

 -5-

Iba ez, appellant was present when the heroin was delivered

and while he was packaging it. Iba ez testified that

appellant had business at his drug point in Puerto Rico, so

he and Iba ez decided to return there with the heroin. Jose

was left behind to return later with two pairs of tennis

shoes that were being loaded with heroin. 

 Iba ez testified that, initially, Iba ez body-carried

one package with 20 pellets of heroin, while appellant

carried a similar package with 16 pellets. Appellant became

scared after their luggage was searched at the Venezuelan

border, so he instructed Iba ez to carry all the heroin

thereafter. The two flew to Caracas and from there to Puerto

Rico without incident. Upon arriving in Puerto Rico,

appellant instructed Iba ez to go up front to be checked

first. Iba ez testified that although he initially told the

authorities that the drugs were his, in fact they belonged to

appellant. 

 Iba ez's testimony was corroborated by the passports

and plane tickets of appellant and Iba ez, which were

admitted into evidence, and the testimony of Richard

Herdmann, a senior customs supervisor. Herdmann testified

that after Iba ez had been found with the heroin, he noticed

that the defendants' passports and plane tickets bore

 -6-

sequential numbers interrupted by one digit.5 As Herdmann 5

was responsible for determining whether any other persons

were involved in drug trafficking, he made inquiries to

determine who had been issued the passport and plane ticket

with the intervening numbers. Herdmann testified that these

items had been issued to Jose, but that he had not boarded

the plane in Venezuela.6  6

 Appellant did not testify at his trial. Although

defense counsel had announced that Jose would be testifying

in appellant's defense, the record indicates that Jose was

arrested at the outset of appellant's trial and charged with

the same crime as appellant (i.e., aiding and abetting the

importation of heroin), and conspiring to import heroin. Jose

was never called as a witness.7 Defense counsel relied on 7

excerpts from the testimony of the customs officers and

Iba ez to argue that Iba ez acted alone in the smuggling

endeavor and that appellant was a legitimate businessman

  

 5Iba ez's passport bore the number 140533715 while 5
appellant's passport bore number 140533717. Both passports
had been issued in Connecticut on March 3, 1995. Similarly,
Iba ez's plane ticket for his return flight to Puerto Rico
bore a number ending in 10, while appellant's plane ticket
ended in 12. 

 6Herdmann also ascertained that Jose's passport had been 6
issued at the same time and place as those of appellant and
Iba ez. 

 7It is undisputed that Jose was tried after appellant and 7
acquitted on all charges. See United States v. Jose Iba ez- 
Maldonado, #95-CR-195(SEC).  

 -7-

unaware of the drug venture. The jury rejected this defense.

Remaining facts will be discussed in the context of the

arguments that appellant raises. 

 II.

 On appeal, appellant asserts that the prosecutor pursued

a "carefully tailored" strategy that was designed to

impermissibly bolster the credibility of the government's

chief witness (Iba ez), while simultaneously depriving

appellant of his own star witness (Jose). Consistent with

this general theme, appellant contends that his conviction

should be reversed on three grounds. First, appellant argues

that certain remarks that the prosecutor made in his rebuttal

argument improperly vouched for the credibility of Iba ez and

expressed the prosecutor's personal opinion about how drug

traffickers work. Second, appellant contends that the

prosecutor violated his Sixth Amendment right to compulsory

process by arresting Jose solely to cause him to invoke his

privilege against self-incrimination, thereby depriving

appellant of his testimony. Finally, appellant contends that

he was deprived of the effective assistance of counsel

because his trial counsel failed to move to suppress the

evidence seized by the customs officers and further failed to

 -8-

protect appellant's right to compulsory process by taking

steps to ameliorate the government's arrest of Jose. 

 We first examine the prosecutor's conduct, mindful that

because defense counsel did not object to it below, we review

only for plain error. See, e.g., United States v. Sullivan, 

85 F.3d 743, 751 (1st Cir. 1996). This means that we must

view the prosecutor's conduct in the context of the entire

trial and that we may reverse only if we conclude that, "'a

miscarriage of justice would otherwise result,'" or that a

plain error "'seriously affect[ed] the fairness, integrity or

public reputation of judicial proceedings.'" United States v. 

Olano, 507 U.S. 725, 736 (1993)(citations omitted); United 

States v. Josleyn, 99 F.3d 1182, 1197 (1st Cir. 1996). 

Appellant has failed to meet this "hard-to-satisfy standard."

United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995). 

 III.

The Prosecutor's Rebuttal 

 In cross-examining Iba ez, defense counsel emphasized

the fact that Iba ez had first told the authorities that the

drugs belonged to him alone. Defense counsel's closing

argument implied that Iba ez had changed his story to

incriminate appellant only after he executed the government's 

plea agreement.8 Appellant now contends that the prosecutor 8

  

 8Referring to Iba ez, defense counsel argued that, "it was 8
not until the government made a plea agreement with him
[that] he reverted (sic) his testimony."

 -9-

engaged in improper witness-vouching when he attempted to

rebut defense counsel's insinuation by referring to the plea

agreement as follows:

 .... that piece of evidence ... will
 reflect that definitely Mr. Iba ez was
 fully debriefed and examined prior to the
 signing of the plea agreement. So the 
 government already heard, knew, 
 investigated, and corroborated the 
 information given by Iba ez prior to the 
 signing of the plea agreement and prior 
 to bringing him here to testify [to] the
 facts to you. Simply it did not become a
 magic act as presented by defendant in
 saying that after the plea agreement was
 made then he changed his -- his version.
 No. 

 These things are investigated thoroughly 
 first before even thinking of signing a 
 plea agreement, corroborated by the 
 agency and also investigated. So read 
 the totality of the plea agreement, and
 you will see the terms of it. Just don't
 take a word of mouth explanation. Just
 read the evidence. It's there in
 evidence. So you will know how this
 takes place, and that will assist you in
 reaching the truth in your deliberations.
 (emphasis supplied). 

 "[A] prosecutor may not imply that the government has

inculpatory information that is not in evidence." United 

States v. Manning, 23 F.3d 570, 573 (1st Cir. 1994)(citations 

omitted). Comments like, "the government ... investigated,

and corroborated the information given by Iba ez" and the

remaining language emphasized above could fairly be

understood to imply that the government had an additional

source of information from which it learned Iba ez's story

 -10-

even before he agreed to cooperate. We agree that these

remarks crossed the line into improper vouching, and the

government essentially concedes as much. See United States 

v. Tajjedini, 996 F.2d 1278, 1284 (1st Cir. 1993) (noting 

that it is improper for a prosecutor to even "seem to rely on

matters not in evidence").

 Appellant next assails the following portion of the

prosecutor's rebuttal, which was made in response to defense

counsel's suggestion that appellant's apparent involvement in

the crime was an accident:

 Ladies and gentlemen ... I submit to you
 [that there are] too many coincidences
 for this to be a mere accident. This is 
 how drug traffickers work. Some are 
 smarter than others and will tell you,
 listen, they almost caught me. You carry
 the drugs. Keep -- keep up front. I'm
 going to stay in the back ... in case
 something happens. That's what happened
 here: a very shrewd trafficker,
 Rodriguez, putting the other guy up front
 so if he gets caught he gets the ...
 problem. (emphasis supplied).

Appellant contends that the comment, "[t]his is how drug

traffickers work" was an improper statement of opinion that

was not supported by the evidence.9 We agree that this 9

comment evinces a poor choice of words. While the statement

may have been construed as a simple rhetorical invitation to

  

 9Appellant argues that whether or not drug traffickers use 9
"mules" to avoid apprehension in the way the prosecutor
claimed that Iba ez was used here was a subject that required
an expert opinion before the prosecutor could comment on it.

 -11-

find appellant guilty based on Iba ez's testimony, it

arguably implied that appellant was guilty because his

alleged conduct, as described by Iba ez, was consistent with

the prosecutor's experience with other drug traffickers.

Such an implication is, of course, improper. See, e.g., 

Tajjedini, 996 F.2d at 1284 ("it is ... improper for a 

prosecutor to insert his own credibility or opinions into

argument"). 

 Nevertheless, we do not think that these remarks

constitute plain error, for the record suggests that it is

highly unlikely that appellant was prejudiced by them. See 

Olano, 507 U.S. at 735 (specific showing of prejudice is 

normally required to establish plain error).10 To be sure, 10

the government's case hinged upon the credibility of Iba ez,

and the government could ill afford to vouch improperly for

him. Nevertheless, both of the remarks challenged here

appear to be instances of accidental overkill rather than a

deliberate attempt to mislead the jury. Iba ez's testimony

  

 10The "plain error" test requires that we consider the 10
prosecutor's remarks in light of all the "attendant
circumstances," including "(1) the extent to which the
prosecutor's conduct is recurrent and/or deliberate, (2) the
extent to which the trial judge's instructions insulated the
jury against, or palliated, the possibility of unfair
prejudice, and (3) the overall strength of the prosecution's
case, with particular regard to the likelihood that any
prejudice might have affected the jury's judgment." Taylor, 
54 F.3d at 977 (citation omitted). The weight of the
evidence of guilt or innocence is the most important factor
in this analysis. See Arrieta-Agressot v. United States, 3 
F.3d 525, 528 (1st Cir. 1993).

 -12-

was, in fact, corroborated by the plane tickets, the

passports, and the Western Union receipts that had been found

in appellant's luggage. We think it likely that this

evidence was the outside corroboration to which the

prosecutor referred in his remarks concerning the plea

agreement and that the jury understood as much. Finally, we

note that the trial judge repeatedly instructed the jury that

the arguments of counsel do not constitute evidence and that

its decision was to be based on the evidence alone. The

record indicates that the jury returned three questions

before reaching its verdict, thus indicating that it

carefully deliberated over the elements of the offenses and

did not simply accept the prosecutor's arguments at face

value.11 We think this sound evidence that the jury obeyed 11

the court's instructions to resolve the case on the evidence

and was not seduced to convict on speculation prompted by the

prosecutor's rebuttal. Accordingly, we are confident that

the prosecutor's improper remarks did not so poison the trial

as to require reversal for plain error.12 12

  

 11The jury requested a copy of the court's instructions 11
and the relevant statutes. It also requested that the court
clearly define the term "possession" and a copy of that
portion of Iba ez's testimony wherein he alleged that
appellant had instructed him to carry all of the heroin. 

 12Appellant also contends that the prosecutor improperly 12
elicited evidence of Iba ez's prior bad acts under the guise
of fulfilling the plea agreement's requirement that he
testify truthfully and that the trial judge should not have
admitted this testimony. See note 2, supra. We agree that 

 -13-

The Arrest of Jose  

 Appellant next contends that the prosecutor violated his

Sixth Amendment right to compulsory process by arresting his

star witness, Jose Iba ez, solely as a ploy to prevent him

from testifying for the defense. In a related vein,

appellant contends that defense counsel rendered ineffective

assistance because he failed to object to Jose's arrest and

failed to seek a court order that granted Jose immunity or

required that the government do so. Both claims rely on the

following additional facts, some of which are beyond the

scope of the record but are conceded as true by the

government.13  13

 It appears that Jose arrived in Puerto Rico three days

after appellant and Iba ez were arrested and that he was

immediately questioned and released by the customs

authorities, who found no drugs. A few months later, and

approximately eleven days before appellant's trial began,

Iba ez agreed to plead guilty and testify for the government.

Shortly thereafter, defense counsel announced that Jose would

  

much of this evidence might have been excluded. But defense
counsel raised no objection to its admission. Instead, he
relied on it as grounds for attacking Iba ez's credibility.
As Iba ez's criminal exploits were just as likely to make the
jury disbelieve him as otherwise, we cannot say admission of
this evidence was plain error.

 13These facts pertain to appellant's compulsory process 13
claim and one of his ineffective assistance of counsel
claims. The latter is discussed in part IV, infra. 

 -14-

be called as a witness for the defense.14 As noted above, 14

Jose was arrested on the first day of appellant's trial, when

he arrived at the courthouse to testify for appellant.

 The record discloses that after announcing that Jose had

been arrested, the Assistant United States Attorney (AUSA)

immediately agreed to make Jose available to defense counsel

to interview and call as a witness. He also observed that

Jose would probably reevaluate with his own counsel whether

he wished to testify. (Tr. 9-11). Defense counsel never

objected to Jose's arrest. Instead, he proceeded with the

trial and made no complaints about a violation of appellant's

right to compulsory process. Appellant alleges that "the

scuffle created by" Jose's arrest prevented defense counsel

from calling him as a witness. He has submitted an affidavit

from his trial counsel to support this assertion.15 15

  

 14This is apparent from defense counsel's motion to 14
continue the trial (original paper #28). That motion
indicates that defense counsel first interviewed a witness
who could provide exculpatory testimony on June 7, 1995,
i.e., five days after Iba ez executed his plea agreement on
June 2, 1995. We presume that the witness identified in the
motion is Jose.

 15Defense counsel averred that Jose could have provided 15
material, exculpatory testimony to the effect that he did not
observe any drug-related activities by appellant during the
time that they spent together in Venezuela. Once Jose was
arrested, counsel believed that his ethical obligations
prohibited him from contacting Jose until after he was
properly represented by counsel. Counsel swore that due to
the fact that he was "heavily engaged" in appellant's defense
during the course of the two-day trial, it was impossible for
him to ascertain the status of Jose's case or to coordinate
with Jose's counsel to address Jose's Fifth Amendment

 -15-

 Appellant now complains that the only explanation for

the timing of the arrest is that it was designed to compel

Jose to invoke his privilege against self-incrimination and

thereby deprive appellant of his testimony.16 At the outset 16

we are compelled to observe that this claim was not raised

below. A strong argument can be made that it has been

waived. Cf. United States v. Theresius Filippi, 918 F.2d 

244, 246 (1st Cir. 1990)(holding defendant waived right to

compulsory process when defense counsel decided to proceed

with trial without material witness). But as the government

does not make this argument, we will give appellant the

benefit of the doubt and assume the claim was forfeited, not

waived. See Olano, 507 U.S. at 733-34 (discussing distinction 

between "waiver" and "forfeiture"). This benefit is of

little moment, for the record, even as supplemented, does not

establish that the arrest of Jose was a plain error that

violated appellant's right to compulsory process. 

 In order to make out a violation of the right to

compulsory process, the appellant must show that "some

contested act or omission (1) can be attributed to the

sovereign and (2) causes the loss or erosion of testimony

  

concerns. Counsel's affidavit concludes with the assertion
that "these circumstances prevented me from calling ... Jose
... as a witness despite the fact that his testimony could
ha[ve] changed the outcome of the trial." 

 16Appellant says that this conclusion is bolstered by the 16
fact that Jose was ultimately acquitted on all charges. 

 -16-

which is both (3) material to the case and (4) favorable to

the accused." United States v. Hoffman, 832 F.2d 1299, 1303 

(1st Cir. 1987). "[C]ausation is an essential building block

in ...[this] edifice," id. It is on this block that 

appellant's claim stumbles. For while it is clear that the

government is responsible for Jose's arrest, and we will

assume, for the sake of argument only, that his testimony

would have been material and exculpatory, the record simply

does not show that the arrest caused the loss of Jose's

testimony. Defense counsel never subpoenaed Jose. He did

not even ascertain that, if subpoenaed, Jose would indeed

invoke the Fifth Amendment and decline to testify.

Consequently, it is not at all clear that Jose's arrest

actually rendered his testimony unavailable. Accordingly, we

cannot say that this arrest was a "plain error" that violated

appellant's right to compulsory process. Cf. United States 

v. Arboleda, 929 F.2d 858, 868 (1st Cir. 1991)(holding 

appellant failed to establish government violated his right

of access to a witness where defense counsel never formally

attempted to meet with witness).

 IV.

Ineffective Assistance of Counsel Claims 

 Appellant argues that defense counsel was ineffective

because he failed to object to the arrest of Jose and failed

to seek a court order that either granted Jose use immunity

 -17-

or required that the government do so. Appellant also

maintains that defense counsel erred by failing to file a

motion to suppress the evidence seized by the customs

inspectors. 

 As a general rule, this court does not consider

ineffective assistance of counsel claims on direct appeal

unless the critical facts are not in dispute and the record

is sufficiently developed to permit reasoned consideration of

the claim. See, e.g., United States v. Collins, 60 F.3d 4, 

7 n. 1 (1st Cir. 1995); United States v. Natanel, 938 F.2d 

302, 309 (1st Cir. 1991), cert. denied, 502 U.S. 1079 (1992). 

We do not think that the present record is sufficiently

developed to allow us to dispose of the foregoing issues.

Accordingly, we decline to reach appellant's ineffective

assistance of counsel claims in the context of this appeal.

Appellant remains free to raise these issues in a motion for

post-conviction relief under 28 U.S.C. 2255. See, e.g., 

United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993), 

cert. denied, 511 U.S. 1086 (1994). The judgment of 

conviction is otherwise affirmed. 

 -18-