Eduardo **ROBINSON–MUÑOZ**, Petitioner,

v.

**UNITED STATES of America**, Respondent.

Civ. No. 92–2696 (JAF).
Crim. No. 90–377.

United States District Court, D. Puerto Rico.

March 30, 1993.

**1138**

## OPINION AND ORDER

FUSTE, District Judge.

We consider here the *pro se* 28 U.S.C. § 2255 petition filed by Eduardo Robinson–Muñoz. Mr. Robinson–Muñoz was convicted by a jury on January 29, 1991, of having violated 46 U.S.C.App. § 1903(a) and 18 U.S.C. § 2 for the possession of marijuana with intent to distribute. This court sentenced Mr. Robinson–Muñoz to one-hundred and twenty months of imprisonment with a five-year term of supervised release. On appeal, the First Circuit affirmed his conviction, upholding the district court's determinations on the admission of a statement by one of his codefendants, the sufficiency of the evidence of intent to possess, and the sufficiency of evidence of jurisdiction of the United States over the vessel. *United States v. Robinson–Muñoz,* 961 F.2d 300 (1st Cir. 1992).

Petitioner now raises a number of other issues in his first section 2255 petition: (1) the admissibility of his codefendant's statement; (2) the sufficiency of the cautionary instruction; (3) the effect of the subsequent discovery of the same codefendant's limited mental capacity; (4) the sufficiency of the evidence proving intent; (5) the jurisdiction of United States to seize the vessel; (6) the soundness of the chain of custody; (7) the appropriateness of the judge's questions to various witnesses; (8) the constitutionality of the seizure of a non-United States vessel by the United States on the high seas; (9) the interference of the government with one of plaintiff's witnesses; (10) prosecutorial misconduct; (11) the culling of Colombians from the jury; and (12) the ineffectiveness of his counsel. Petitioner may have raised other arguments; however, the petition is so poorly organized that the above-listed arguments are the only ones clear enough to be considered by the court.

Eduardo Robinson–Muñoz, petitioner pro se.

Daniel López–Romo, U.S. Atty., D. Puerto Rico, San Juan, PR, for respondent.

## I.

### Facts

On October 13, 1990, a United States Navy plane spotted a vessel heading in a northbound direction about ninety miles from the

coast of Colombia. As it was being overflown, the vessel began behaving strangely, eventually making a 180–degree course change. The plane then radioed a Navy vessel, the USS DALE ("DALE"), which proceeded to intercept the vessel. When they came upon the vessel, it was revealed to be a small, rundown, wooden vessel without fishing gear, riding low in the water, and too far out in the ocean for its size—all characteristics which fit the profile for drug-smuggling vessels. It had no flag, but did have the name M/V DELFIN ("DELFIN") painted on a plaque which was nailed to the bow. After attempting for almost an hour to contact the vessel in English, the Coast Guard team aboard the DALE switched to Spanish. After another fifteen minutes, the master of the DELFIN answered, claiming the vessel was of Colombian registry, but that he had no papers on board. The Coast Guard then radioed the Colombian government and requested a statement of no objection to board the vessel. The Colombian officials responded that the Coast Guard could board the vessel, but should refrain from taking any legal action until the Colombian government had verified whether or not the vessel was registered in Colombia.

About two hours after the 550–foot DALE had pulled alongside the 35–foot DELFIN, the boarding party took a semi-rigid inflatable boat and motored out to the DELFIN. Upon boarding, one of the Coast Guard officers, Petty Officer Villamil, testified that he smelled marijuana even before setting foot on the DELFIN. He also testified that after he had boarded, someone, whom he later identified as the master of the vessel, approached him and stated in Spanish that "you've caught us." The master also stated that there was marijuana on board and pointed out burlap-covered bales in the hold. These bales were partially concealed in the largely open hold behind plywood partitions. The burlap-covered bales revealed 2,178 kgs. of marijuana.

The Coast Guard officers were unable to find any indication of registry on the vessel. Identification numbers normally present on all vessels were absent from the DELFIN, indicating that the vessel was most likely homemade. Upon receiving confirmation from the Colombian government that the vessel was not registered in Colombia, the Coast Guard declared the vessel stateless and arrested the master and crew. They were all given Miranda warnings in Spanish, at which point all four stated that they did not wish to make any statements. They were all taken on board the DALE.

The master, Abel Rojas, was eventually revealed to be a displaced Cuban citizen who had at one point lived in Indiana. He had been living in Colombia, after having left the United States upon the expiration of a prison term for possession of marijuana. The crew were three fishermen from Devulla, Colombia: Eduardo Robinson–Muñoz, Lázaro Pérez–Redondo, and Alberto Sabán–Gutiérrez. They had been recruited by Abel Rojas, who often bought fish from Mr. Sabán–Gutiérrez. According to the testimony of Mr. Sabán–Gutiérrez, they were offered approximately $1,000 each to make the trip. He also testified that they had no idea of the nature of the trip. Mr. Rojas testified that he had allowed them to think that they would be smuggling goods like alcohol and tobacco. Two days before the DELFIN was stopped, Rojas had taken the three fishermen to the DELFIN in a speed boat. There they had taken turns steering the boat. The gear of the crew was found in areas of the vessel from which the marijuana bales were visible. To start the engine, it was necessary to have access to the engine which was behind several bales. However, the bedding was in an area separate from the bales and the bales were partially concealed.

One of the defendants, Sabán–Gutiérrez, made a statement to one of the Coast Guard officers during the voyage to Puerto Rico, the nearest U.S. port. This statement became the center of much controversy at trial. One evening, returning from the bathroom, Sabán–Gutiérrez broke down and began to cry. When Petty Officer Villamil asked him what was wrong, Sabán–Gutiérrez told him that he was thinking of his family. He said that his wife had asked him not to get involved in trafficking. When the government attempted to have Petty Officer Villamil testify to this statement, all the defendants ob-

jected. All the defendants, except Abel Rojas, who pled guilty, were being tried together. No motion for severing the trials had ever been made. This judge admitted the statement. However, he cautioned the jury that this statement only applied to Sabán–Gutiérrez and no inference should be drawn to the other defendants. The First Circuit found that the statement did not have any impact upon the rights of the other defendants. *Robinson–Muñoz*, 961 F.2d at 303–04.[1]

Aside from this dispute, the trial of the three codefendants proceeded smoothly. There was talk of contacting the Colombian consul, Teresa de Berardinetti, and asking her to testify. However, the record does not reflect whether the petitioner's attorney was ever able to contact her. Petitioner claims she arrived at the court to testify, but was excluded from the courtroom by U.S. Marshals.

Petitioner was convicted along with his two codefendants. Petitioner appealed his conviction; however, the district court was affirmed. From his correspondence with his attorney, we note that petitioner had a strong interest in the progress of his defense. However, he appears to have had considerable difficulty contacting his attorney and learning about the nature of his appeal. Petitioner appears convinced that he was unjustly and involuntarily brought into the United States to be tried, a belief which has resulted in the petition we now have before us.

## II.

### *Section 2255*

The more recent trend in the development of section 2255 jurisprudence has been for the Supreme Court to narrow the scope of the relief available through habeas corpus.[2] Section 2255 allows for an opportunity to attack a final judgment; however, it should not undermine the mechanisms for review which exist as part of the original proceedings. *See U.S. v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 2239–40, 60 L.Ed.2d 805 (1979); *Hill v. United States*, 368 U.S. 424, 428–29, 82 S.Ct. 468, 471–72, 7 L.Ed.2d 417 (1962); *Sunal v. Large*, 332 U.S. 174, 178, 67 S.Ct. 1588, 1590, 91 L.Ed.2d 1982 (1947). "When Congress enacted section 2255 in 1948, it simplified the procedure for making a collateral attack on a final judgment entered in a federal criminal case, but it did not purport to modify the basic distinction between direct review and collateral review." *U.S. v. Addonizio*, 442 U.S. at 184, 99 S.Ct. at 2240. For this reason, in a section 2255 petition, where there has been a procedural default, *i.e.*, a petitioner has failed to properly raise an issue in trial or on appeal, a petitioner may be barred from bringing a collateral attack unless he shows cause for the failure and prejudice from the failure. *Coleman v. Thompson*, —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).[3] In *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), where the dissent by Justice Brennan pointed out that section 2254 and section 2255 constituted significant-

---

1. It was subsequently discovered that Sabán–Gutiérrez had an IQ of 57 and he was granted a retrial. Since the First Circuit's decision in *Robinson–Muñoz* took place after Sabán–Gutiérrez' limited intelligence was discovered, we infer that they took this fact into account when reaching their decision as to the impact of his statement upon the rights of his codefendants. *Id.* at n. 1. In any event, the reader is referred to the published decisions on Sabán–Gutiérrez and the new trial afforded him. *United States v. Sabán–Gutiérrez*, 783 F.Supp. 1538 (D.P.R.1991), *aff'd.*, 961 F.2d 1565 (1st Cir.1992).

2. Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure*, § 27.2 at 295 (1984) ("*Stone* and subsequent opinions suggest that the Court today

views the narrower interpretation of the 1867 Act as the more accurate reflection of how Congress anticipated that the Act would be applied to persons detained pursuant to a conviction."); Erwin Chemerinsky, *Federal Jurisdiction* § 15.2 at 686 (1989) ("In sharp contrast, the Burger Court narrowed the availability of habeas corpus."); Charles Alan Wright, *The Law of Federal Courts* § 53 at 346 (1983) ("In recent years states that have urged the Court to cut back on the scope of the writ have often found a receptive audience.").

3. These cases effectively overruled the "deliberate bypass" standard for section 2254 petitioners as articulated in *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

ly different settings, the Supreme Court wrote that "the Federal Government, no less than the States, has an interest in the finality of its criminal judgments," and proceeded to apply the "cause and prejudice" standard in a petition brought under section 2255.

The First Circuit does appear to have accepted *Frady* as conclusive evidence that the "cause and prejudice" standard for procedural default may be applied in the section 2255 context.[4] We believe that the recent decision of the First Circuit to apply to section 2255 petitions the reasoning of the Supreme Court in *McCleskey v. Zant*, ⸺ U.S. ⸺, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (holding that, in a section 2254 context, a second petition is subject to the "cause and prejudice" standard), is indicative of a willingness to apply the "cause and prejudice" standard across the board. *Andiarena v. United States*, 967 F.2d 715 (1st Cir.1992). This, together with the long-standing position of the First Circuit, that "a defendant cannot, by means of a section 2255 proceeding, revive rights lost by a voluntary failure to appeal," *López–Torres v. United States*, 876 F.2d 4, 5 (1st Cir.), *cert. denied*, 493 U.S. 979, 110 S.Ct. 508, 107 L.Ed.2d 510 (1989), suggests that the First Circuit indeed endorses a "cause and prejudice" approach to procedural default.

■ From this jurisprudence, we must determine which claims are available for section 2255 review. While section 2255 is not statutorily limited to constitutional claims, it has been interpreted as only being available for non-constitutional claims if "the claimed error constitute[s] 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *U.S. v. Addonizio*, 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979) (citing *Hill v. United States*, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962));

*United States v. Timmreck*, 441 U.S. 780, 783, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979); *Barrett v. United States*, 965 F.2d 1184, 1188 (1st Cir.1992) (citing *Fasano v. Hall*, 615 F.2d 555, 557 (1st Cir.), *cert. denied*, 449 U.S. 867, 101 S.Ct. 201, 66 L.Ed.2d 86 (1980)); *Desmond v. United States*, 333 F.2d 378, 380 (1st Cir.1964).[5] A fundamental defect has been interpreted to mean that if the ordinary processes of trial and appeal are or clearly would have been functionally inadequate to correct the error, a collateral attack is justified. *See Note, Federal Habeas Corpus Review of Nonconstitutional Errors*, 83 Colum.L.Rev. 975, 1024 (1983). The practical result of all this is that the failure to raise a nonconstitutional error at the proper procedural juncture effectively bars collateral attack. *Stone v. Powell*, 428 U.S. 465, 477 n. 10, 96 S.Ct. 3037, 3044 n. 10, 49 L.Ed.2d 1067 (1976); *Sunal v. Large*, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947); *see also Kaufman v. United States*, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969). Therefore, we consider all of petitioner's nonconstitutional assignments of error to be waived and we will consider all of petitioner's constitutional assignments of error.

Once the court has decided that a claim is amenable to consideration under section 2255, the petitioner is required to demonstrate, by a preponderance of the evidence, not only that he is entitled to section 2255 relief, but also that he is entitled to an evidentiary hearing. *Barrett v. United States*, 965 F.2d 1184 (1st Cir.1992) (citing *Myatt v. United States*, 875 F.2d 8, 11 (1st Cir.1989)). An evidentiary hearing is not required where the section 2255 petition, any accompanying exhibits, and the record evidence "plainly [reveals] ... that the movant is not entitled to relief." Rule 4(b), Rules Governing Sec-

---

**4.** In several unpublished opinions, the circuit has indicated that they are not inclined to reach the question of whether to adopt the "cause and prejudice" approach to procedural default in the section 2255 context. "As to whether the Frady cause-and-prejudice standards apply in § 2255 proceedings to constitutional claims not raised on direct appeal, the caselaw is still evolving. A majority of courts have held that they do, while some others have continued to employ the "deliberate-bypass" standard. We need not decide this issue here. *See Murchu v. United States*, 926

F.2d 50, 53 n. 4 (1st Cir.1991) (per curiam) (raising question without deciding it)." *Mount v. United States*, 1991 U.S.App. LEXIS 20449 at *6 (1st Cir.1991).

**5.** This appears to suggest the following reasoning: When nonconstitutional errors rise to a level where they essentially constitute a due process error, then they may be considered in the context of section 2255. *See Johnson v. United States*, 805 F.2d 1284, 1287 (7th Cir.1986).

tion 2255 Proceedings. *See Dziurgot v. Luther,* 897 F.2d 1222, 1225 (1st Cir.1990). Therefore, summary dismissal is appropriate when the section 2255 petition " '(1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case.' " *United States v. DiCarlo,* 575 F.2d 952, 954 (1st Cir.), *cert. denied,* 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 (1978) (quoting *Morgan v. Hogan,* 494 F.2d 1220, 1222 (1st Cir.1974). In this case, the section 2255 petition raises a multitude of issues. After sifting through them, we find that all are either inadequately presented or refuted by facts in the record. Therefore, we dismiss the petitioner's claims without granting him an evidentiary hearing.

## III.

### The Petition

We have divided the issues into several categories: Issues already considered on appeal, nonconstitutional issues, issues subject to procedural default, and constitutional issues.

### A. Issues Considered on Appeal

■ Issues decided on direct appeal generally cannot be relitigated in a section 2255 motion. *United States v. Michaud,* 901 F.2d 5, 6 (1st Cir.1990) (per curiam); *Tracey v. United States,* 739 F.2d 679, 682 (1st Cir. 1984), *cert. denied,* 469 U.S. 1109, 105 S.Ct. 787, 83 L.Ed.2d 781 (1985). Only if there has been an intervening change in the law may they be reconsidered. *Davis v. United States,* 417 U.S. 333, 342, 94 S.Ct. 2298, 2303, 41 L.Ed.2d 109 (1974). Petitioner raises the following arguments in his petition that were already considered on appeal: (1) the admissibility of Sabán–Gutiérrez' statement; (2) the sufficiency of the cautionary instruction; (3) the effect of the subsequent discovery of Sabán–Gutiérrez' limited mental capacity; (4) the sufficiency of the evidence proving intent, and (5) jurisdiction of the United States to seize vessel. He has not alleged that the law governing any of these issues has changed,

nor have we been able to ascertain any such change through our own research. Therefore, petitioner is barred from raising issues considered on appeal for a second time in the context of a federal habeas corpus petition.

### B. Nonconstitutional Issues

Petitioner has raised two claims which are inappropriate for consideration in the context of a section 2255 petition because they do not allege a lack of jurisdiction or an error so egregious as to rise to the level of a constitutional error. These claims are: (1) that the chain of custody was bad, and (2) that the judge inappropriately questioned the witnesses. According to the case law developed under section 2255, unless these are defects that represent a fundamental miscarriage of justice, we cannot consider them here.

### 1. Chain of Custody

■ Evidence of a chain of custody is required by Fed.R.Evid. 901(a).[6] "The possibility of a break in the chain of custody goes only to the weight of the evidence." *United States v. Harrington,* 923 F.2d 1371, 1374 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). Where "the offered evidence is of the type that is not readily identifiable or is susceptible of alteration, a testimonial tracing of the chain of custody is necessary." *United States v. Abreu,* 952 F.2d 1458, 1467 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1695, 118 L.Ed.2d 406 (1992). This is clearly not a question which implicates the petitioner's constitutional rights. Petitioner failed to object at trial or to raise this issue on appeal. Therefore, only if there is a fundamental defect, may we consider the issue.

There was nothing in the manner in which the chain of custody was established in this case that would constitute a fundamental defect. There was extensive testimony as to the chain of custody. It traced the bales of marijuana from the boarding team, composed of Petty Officer Cox and Petty Officer Villamil, to Mr. Walen on the Coast Guard

---

**6.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a

finding that the matter in question is what its proponent claims.
Fed.R.Evid. 901(a).

Cutter HAMILTON. The bales were then transferred to Robert Jusino, a U.S. Customs Agent. Testimony smoothly established the custody of the marijuana up to trial. Petitioner presents no evidence which would cause us to question this testimony. All he does is point to places in the record which give inconsistent reports of the amount of drugs on the vessel. However, the mere fact that there are different amounts noted in different places in the record is not enough to undermine the chain of custody, especially since the lowest amount among those noted was used for purposes of calculating the sentence. Petitioner must allege more than this to establish that there was some defect in the chain of custody.

### 2. *Judicial Examination of Witness*

■ A district judge has the power to question witnesses. Fed.R.Evid. 614(b). "The trial judge may, if he deems necessary, examine witnesses in order to provide a clear presentation of the issues, so long as an attitude of impartiality is preserved." *United States v. González–Torres*, 980 F.2d 788 (1st Cir.1992); *see also United States v. Paz Uribe*, 891 F.2d 396, 400 (1st Cir.1989), *cert. denied*, 495 U.S. 951, 110 S.Ct. 2216, 109 L.Ed.2d 542 (1990); *United States v. Paiva*, 892 F.2d 148, 159 (1st Cir.1989). A defendant must show that the judge's questioning "seriously affected the fundamental fairness and basic integrity of the proceedings below." *González–Torres*, 980 F.2d at 791. Again, this is not a question that implicates the petitioner's constitutional rights. Therefore, since he failed either to object at trial or appeal this issue, he has waived the right to raise this objection to the trial proceedings unless it constitutes a fundamental defect.

The two spots in the record where this judge personally questioned a witness do not implicate the fairness of the proceeding. At one point, the court questioned Officer Cox to clarify his testimony about the burlap sacks covering the bales of marijuana. If anything, this attempt to clarify the facts was as helpful to the defendants as to the prosecution, since it established that bales are normally packaged with plastic and burlap which would suggest that marijuana smell

pervading the boat was minimal. The court also questioned Abel Rojas and raised Rojas' previous conviction, but his conviction for possession of marijuana had already been raised on direct examination. Therefore, any prejudice resulting from this information was harmless. This judge's other questions did not in any way undermine the testimony of the witness that the three defendants did not know the nature of the DELFIN's cargo. Moreover, when instructing the jury at the beginning of the trial, the judge specifically explained the reasons for any future intervention.

> Nothing that the Court may say or do during the course of the proceedings is intended to indicate, or should be taken by you as indicating, what the verdict should be.
>
> I am here to preside in this case. I am here to be like the umpire or the auditor, the person that will make decisions here. I will have to make rulings on the evidence.
>
> The role of the judge is not a passive role. It is an active role. I have to try to balance this case out and give the best of me to the parties, also.
>
> So my participation is not intended to hint anything regarding the outcome of the case.
>
> You are the fact finders. I am not the fact finder, and it is your own deliberations, the ones that will decide what the facts of the case are.

Tr. of Proceedings, Vol. I, *Docket Document No. 69*, at 7–8. At the end of the case, and as part of the jury charge, this judge once again explained to the jury the judge's intervention.

> I told you at the beginning that the judge is here to preside over the case. I am here to guide your proceedings, to make rulings, to decide the course of matters that are procedurally related. I was not here to simply sit and watch.
>
> If you think that I said something or asked a question or intervened in any form, and that you think that I had a view of the case because of what I said or did or acted upon, you should take that out of your mind. I am here to do my part, but

*nothing I did or said or intimated is intended to guide you or to lead you as to what the verdict should be.*

Tr. of Proceedings, Vol. III, *Docket Document No. 71*, at 52. There is nothing here to suggest an inappropriate question, much less a miscarriage of justice.

### C. *Constitutional Issues*

The arguments raised by petitioner which have a constitutional dimension are the following: (1) the jurisdiction of the United States to seize a non-United States vessel on the high seas; (2) government interference with plaintiff's witnesses; (3) prosecutorial misconduct; (4) prejudicial use of peremptory challenges, and (5) ineffective assistance of counsel. Petitioner has not shown "cause" as to why he failed to raise these issues either at trial or on appeal or how prejudice entitles him to raise them now. However, given the potential constitutional implications, we will not treat these issues as barred and will consider them on their merits.

### 1. *Jurisdiction*

Petitioner argues that the statute under which he was convicted, 46 U.S.C.App. § 1903, is unconstitutional because it allows the improper exercise of jurisdiction over the activities of non-United States citizens which occur outside of United States territory, where there is no proof that they had any intent to continue those activities in United States territory. Petitioner argues that all federal criminal statutes contemplate a nexus between the defendant and the United States when they are applied extraterritorially. *United States v. Peterson,* 812 F.2d 486 (9th Cir.1987). Therefore, the extraterritorial application of a law where there is no proven nexus between the defendant and the United States is contrary to statutory intent. Petitioner also argues that courts should not construe a congressional statute in a way that violates international law. *Chua Han Mow v. United States,* 730 F.2d 1308, 1311 (9th Cir.1984).

 We must first point out that petitioner lacks standing to assert a violation of international law. The statute specifically states that any potential violation of international law in the enforcement of the statute may solely be redressed by a foreign nation. 46 U.S.C.App. § 1903(d). Next, several circuits, including the First Circuit, have found the extraterritorial application of the statute constitutional. Section 1903 was clearly written with the intent that it should apply extraterritorially.[7] Section 1903 is the recodified version of an earlier statute that forbid offshore drug possession, 21 U.S.C. § 955a(c). Section 955a was found to be a constitutional exercise of congressional power by the First Circuit. *United States v. Smith,* 680 F.2d 255, 258 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). Section 1903 itself has been found to be a constitutional exercise of congressional authority by both the Ninth and Eleventh circuits. *United States v. Aikins,* 946 F.2d 608, 613–14 (9th Cir.1990); *United States v. Mena,* 863 F.2d 1522, 1527 (11th Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 109, 107 L.Ed.2d 72 (1989); *see also United States v. Marino–Garcia,* 679 F.2d 1373 (11th Cir. 1982), *cert. denied,* 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983). We follow their reasoning, as well as that of the First Circuit, in relation to section 955a, and find that the statute is constitutional.

### 2. *Prosecutorial Misconduct*

 The petitioner makes allegations of prosecutorial misconduct. The range of

---

7. The statute itself states that "[t]his section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States." 46 U.S.C.App. § 1903(h). That the statute also intended to encompass non-United States citizens committing acts outside the United States with no intention of entering the United States is clear from the definition of "vessels subject to the jurisdiction of the United States." 46 U.S.C.App. § 1903(c). The statute makes provision for the apprehension of vessels both on the high seas and in the territorial waters of another nation. 46 U.S.C.App. §§ 1903(c)(1)(B) & (E). And the statute is also clearly intended to apply to non-United States vessels, since it allows the apprehension of stateless vessels and vessels registered to other nations which have consented to the exercise of U.S. jurisdiction. 46 U.S.C.App. §§ 1903(c)(1)(A) & (C). These locations and vessels could easily involve non-United States citizens with no intention of entering the United States.

possible misconduct by the government in a criminal case is great. The petitioner has alleged that the prosecutor indicated a personal belief in the credibility of the witnesses and made comments about petitioner's nationality. A prosecutor may not inject personal beliefs into her argument to the jury. *United States v. Modica*, 663 F.2d 1173, 1178–79 (2nd Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *see also United States v. Garcia*, 818 F.2d 136, 143–44 (1st Cir.1987). Nor can a prosecutor appeal to ethnic or national prejudice. *United States v. Goldman*, 563 F.2d 501, 504 (1st Cir.1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978). No action is warranted, however, unless we are able to conclude with a high degree of confidence that the alleged prosecutorial misconduct did affect the outcome of the trial. *United States v. Mejia–Lozano*, 829 F.2d 268, 274 (1st Cir.1987); *United States v. Panet–Collazo*, 960 F.2d 256, 260 (1st Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 220, 121 L.Ed.2d 158 (1992); *United States v. Boldt*, 929 F.2d 35, 41 (1st Cir.1991).

■ Petitioner has not indicated any spots in the record where the prosecutor specifically injected personal belief into her argument. Nor has our review of the record revealed any remarks that are objectionable instances of personal comment. The prosecutor was developing an argument but did not indicate that she personally felt one witness or another was more credible. Our review of the trial transcript has also revealed one instance on which the prosecutor perhaps made a disparaging comment about Colombia. She was speaking of guarding the seas against contraband and stated that they needed to be guarded "[s]pecifically, from the drug lords of Colombia, which is a drug source country." This comment was promptly objected to by the petitioner's attorney. The judge did not agree with counsel that this comment implied defendants were guilty because they were Colombian. Petitioner did not appeal the judge's ruling. We feel that this comment, although perhaps appealing to a human tendency to ascribe national characteristics to individuals, simply states a fact, namely that Colombia has drug lords and is a source of drugs. However, we do not feel that this comment is evidence of misconduct. Nor could it be said to have affected the outcome of the trial. We found no other instances which might be described as prosecutorial misconduct.[8]

### 3. Government Interference with a Witness

■ A defendant has a sixth amendment right to present witnesses. And that right may not be transgressed by impermissible governmental interference. *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (citing *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967)); *see also United States v. Hoffman*, 832 F.2d 1299 (1st Cir.1987). However, the petitioner must do more than just show the witness was prevented from testifying, "some plausible showing of how their testimony would have been both material and favorable to the defense." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). As the doctrine is interpreted by the First Circuit, "an accused must, at a minimum, demonstrate some plausible nexus between the challenged governmental conduct and the absence of

---

**8.** We note that at the time of the jury charge, the following instruction was given to the panel:

It is your duty to decide the case based upon the evidence, and you should not allow prejudice or sympathy to enter into consideration in the deliberation process. A maxim is always the following: we should always give everybody who comes to court equal justice.

This means that we should all try to measure persons and circumstances by the same yardstick. That is a basic premise of our system of law.

And you know from what I told you in the beginning, when I was impanelling you, that nobody should ever decide a case considering somebody's nationality or somebody's origin or somebody's circumstances.

We all, as human beings, have our own inclinations, our own likes and dislikes. We are human beings. We have prejudices. We have our own public opinion about things, but when you are judging, you have to always try to leave those things outside the judging process.

Tr. of Proceedings, Vol. III, *Docket Document No. 71*, at 48.

certain testimony." *Hoffman,* 832 F.2d at 1303. "There can be no violation of the defense's right to present evidence, we think, unless some contested act or omission (1) càn be attributed to the sovereign and (2) causes the loss or erosion of testimony which is both (3) material to the case and (4) favorable to the accused." *Id.*

 There is clearly a contested act attributed to the sovereign: Petitioner argues that the U.S. Marshals prevented the Colombian consul from entering the building. There is discussion in the record concerning the consul's possible testimony. It appears from the record that the petitioner's attorney was unable to contact the Colombian consul in time to have her testify. The record does not reflect, however, that she arrived any time before the jury was released for deliberations. Nor has petitioner submitted an affidavit from the consul or any other person stating that she was indeed excluded. However, if we assume that she did not arrive because she was excluded by the Marshals, the petitioner must still show that her testimony would have been material and favorable. We have indications from the record as to what her testimony would have been. Petitioner's attorney stated that "I understand that she is very well informed in relation to the place where these three fishermen come from, to establish that they are living here in subhuman conditions; that this is probably one place that is separate from the civilized world." The former Colombian consul who, we presume, had no personal knowledge of the petitioner, could really only testify as to general conditions in the region of Colombia where the petitioner lived. Therefore, her testimony, while relevant, was certainly not material to the question of whether petitioner had the intent to possess. Indeed, it could even have been unfavorable because it would show that petitioner and his codefendants were desperate enough to accept work they knew was illegal.

### 4. *Prejudicial Use of Peremptory Strikes*

 Petitioner argues that there was no one on the jury who "knew the 'living conditions, and lifestyles' of the appellant or codefendants." He argues that all of his peers were struck from the jury pool in violation of the requirements of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This could also be considered a violation of the sixth amendment's fair cross-section requirement. "For a defendant to establish a prima facie case of purposeful discrimination in the selection of the petit jury, based solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial, the defendant first must show that he is a member of a cognizable racial group." *United States v. Sgro,* 816 F.2d 30, 33 (1st Cir.1987), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1021, 98 L.Ed.2d 986 (1988). Then, he must show that the government exercised its peremptory challenges so as to exclude the members of his group. *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722–23. And that there is a connection between the membership of the jurors in the group and their exclusion by the government. Once the defendant has made this showing, the government must articulate clear, reasonably specific, neutral reasons for exercising its peremptory challenges in the manner they were exercised. *Id.* at 98 n. 20, 106 S.Ct. at 1724 n. 20.

Our ability to properly consider this argument suffers from the petitioner's failure to provide us with any evidence. It is clear that petitioner is a Colombian citizen. And, as we have stated above, a distinct nationality can be a protected group. However, petitioner has not alleged that any of the excluded jurors were Colombian citizens. All we can see from the record is that the jury was composed of individuals with Spanish surnames. These individuals might just as easily have been Puerto Rican as Colombian. Aside from failing to show the presence of any Colombian citizens in the jury pool, petitioner has also failed to indicate that the prosecution's peremptory challenges were used exclusively on Colombian citizens on the basis of their citizenship. For these reasons, we cannot find that petitioner is entitled to relief on these grounds.

### 5. *Ineffective Assistance of Counsel*

 The sixth amendment guarantee of assistance of counsel has been interpreted as

assuring a defendant a meaningful defense by his attorney. *United States v. Wade*, 388 U.S. 218, 225, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967). A two-step process for determining when the assistance has been ineffective has developed: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *see also Bonneau v. United States*, 961 F.2d 17, 19 (1st Cir.1992). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and strategic choices made after thorough investigation of law and facts. *Barrett v. United States*, 965 F.2d 1184, 1193 (1st Cir.1992).

▮ Petitioner points to numerous facts which he sees as having compromised his defense. First, petitioner alleges that there was a relationship between his attorney and the prosecuting attorney which compromised his representations: "[F]urthermore, the Prosecutor were [sic] taught by Mr. Noriega at Law School, and there was rumored to a [sic] intimate relationship between them at the time." He attributes his counsel's attempt to get him to agree to a plea agreement to the relationship between the two attorneys. We do not see that this as a reasonable inference, since plea agreements are standard practice. Indeed, if the agreement is advantageous to the defendant, it would be problematic if counsel had not offered the plea agreement to the petitioner. Even if the two attorneys had some social relationship outside of their professional life, that in itself is not enough to assume that one would influence the other enough to prejudice the petitioner's defense. Attorneys often know each other socially without allowing that relationship to influence their professional interactions. Petitioner would have to present evidence showing that their relationship was of a compromising nature to support such a claim. Such evidence is lacking here.

▮ Petitioner also cites his attorney's failure to file the following motions as support for his ineffective assistance claim: A motion for mistrial, a motion to dismiss indictment, a motion for change of venue, a motion for severance, and a motion for a new trial. Petitioner's attorney certainly could have filed a motion for severance, especially given the problems caused by Sabán–Gutiérrez' statements. However, he also could have reasonably adopted the position that the remark was excludable, and indeed he worked hard to have the remark excluded. The simple failure to bring a motion, where there is an acceptable alternative strategy, does not constitute ineffective assistance of counsel. As for the other motions, he did join in a Rule 29 motion at the end of the government's evidence, and that motion was renewed after the close of petitioner's case. Since petitioner's attorney appealed the conviction, his decision not to file a motion for a new trial was again within the realm of possible strategy. None of the motion's listed by petitioner as absent are so crucial to his defense that we must conclude that petitioner's attorney was not acting as counsel within the sixth amendment sense of the word.

▮ The other behavior which petitioner mentions to prove ineffective assistance is his attorney's failure to object to prejudicial comments made by the prosecutor vis-a-vis petitioner's nationality, his failure to protect petitioner from vindictive prosecution resulting from his decision to go to trial, his refusal to use defenses suggested by the petitioner, and his failure to communicate with defendant after the trial. Efficient representation does not require that an attorney object to every problematic comment by the prosecution. We also note that the petitioner has not specifically identified any of these comments in the record. Petitioner's prosecution hardly seems vindictive given that his two codefendants also chose to go to trial and were also found guilty. The petitioner would have to more concretely point out the basis for his calling the prosecution vindictive, in

order for us to further investigate this point. And, finally, the failure of petitioner's attorney to communicate with him promptly, which petitioner has documented admirably, is troubling. However, the fact that an attorney does not communicate well with his client in the appellate phase of a case, when the facts are well documented and the legal issues have been established, is not enough to find that he did not render a defendant effective assistance.

## IV.

### *Conclusion*

The lack of evidence presented by the petitioner has unfortunately made it difficult for us to sort worthless claims from those which might have some merit. We have dealt with every issue raised in the petition which arguably could have some factual basis in the record. Since none of these issues required further investigation, we dismissed them without granting the petitioner the opportunity to present additional evidence. We DENY this section 2255 petition.

**IT IS SO ORDERED.**